# FEHN v. SCHLICKLING et al.—175 S. W. (2d) 37.

Eastern Section.   July 3, 1943.

Petition for Certiorari Denied by Supreme Court, October 16, 1943.

Coffey & Durand, T. Pope Shepherd, and Clifford Curry, all of Chattanooga, for appellant.

Wilkerson & Wilkerson, of Chattanooga, for appellee.

BURNETT, J. Three questions are raised on this appeal, to-wit: (1) Are the original and amended bills repugnant or inconsistent? (2) Is the claim of the original complainant (Magdalena Schlickling Fehn) barred by the statute of limitations? Code 1932, secs. 8600, 8601, 8582. (3) Can a court of chancery declare a lien on real property purchased by the defendant Albert Schlickling before the money was furnished with which he placed improvements on the real property?

The chancellor answered the first two questions in the negative and the third in the affirmative.

The complainant (below), Magdalena Schlickling Fehn, and the defendant (below), Albert Schlickling, are sister and brother. The defendants (below), Albert Schlickling and Martha Schlickling, are husband and wife but are estranged and divorce proceedings are pending. All three parties are natives of Germany. The defendants are naturalized citizens of the United States.

The complainant was a mid-wife in Germany. From her profession she saved her earnings and sent to her brother, Albert Schlickling, $400 in 1924, $600 in 1926. From her earnings she had purchased a home in the Saar region in Germany. When this region was occupied by the French she sold this home to the French Government. The money from this sale, $7,417.65, was sent to her brother here in America in the summer of 1929. The purpose of sending this money to her brother was for safe-keeping and investment. We are not concerned with the first two sums above mentioned. The $7,417.65 was deposited by the brother in a savings account to his credit and was spent by him in placing improvements on certain lots he owned in Chattanooga, Tennessee. $1,000 of this sum was spent in the purchase of another lot.

The defendants were married in December, 1929 (after the $7,417.65 was received by Albert). Prior to their marriage they had long been sweethearts. She had loaned him small sums of money from time to time; they had purchased property in their joint unmarried names and we think the weight of the proof shows she knew of his having this $7,417.65 and its source. After their marriage Martha continued her profession as a trained nurse and for some time as she would be called on cases. Albert meantime was working at various things. In 1930 he built houses on the lots in question and purchased another lot with the money ($7,417.65, and accumulated interest) of his sister. Martha owned certain real estate which was subject to a mortgage. The property of Martha and that in Albert's name, on which his sister's money had placed the improvements and that which he had purchased with her money, was all placed under a blanket mortgage. This property was rented by Albert

and Martha and the rents collected by them. Some small portion of the rents was sent from time to time to the sister in Germany.

In 1933 Martha visited her sister-in-law in Germany and then showed her pictures of the houses and told her that her money was invested in these houses. In 1936 Magdalena came to the America and lived with the defendants in Chattanooga. She married a Mr. Fehn in 1938. About the time of the complainant's marriage she contemplated returning to Germany when the instrument, sued on in the original bill was drafted under the following circumstances: "The main purpose. was Mrs. Fehn was going to Germany, planned to, and there was some arrangement the German Government has that American money is worth, I believe, almost twice as much in Germany if it is sent over as a gift, or for support or something to that effect, and Mrs. Fehn was going to accept these payments and she was planning on leaving right away for Germany, as I understood it."

The original bill sought a judgment against both defendants on the contract made under the circumstances above detailed. This contract was made in 1938, was signed by both defendants acknowledging an indebtedness of $8,500 and agreeing to pay $25 per month for complainant's life, the balance to be forgiven on her death. The amended bill (filed before any plea to the original bill) averred this indebtedness sued for was a trust fund which had been placed with the defendant Albert and which he had expended on the property as heretofore detailed.

Albert agrees with his sister in her contentions. He took her to her lawyer and since she could not speak English acted as her interpreter. This is assigned as

the reason for the amended bill. Albert apparently was very cruel to his wife and it was for this reason she signed the instrument heretofore referred to. The defendants became estranged. Martha sued Albert to set up her property rights. Albert filed a cross suit seeking a divorce. Then it was this suit was instituted seeking to set up the rights of the sister in this property. The chancellor rendered judgment against Albert for the $8,500—he did not appeal. He declared a lien on the property in which the $7,417.65 fund had been spent subject only to a first mortgage. To this decree Martha excepts and has appealed here.

■■ It is argued with much force that the remedies sought in the original and amended bills are inconsistent and that therefore this action should fail. The original bill seeks judgment on a contract. The amended bill (filed before any defense to the original bill) seeks to set up a trust in certain properties on which the money sued for in the original bill was spent. We do not think the remedies inconsistent or repugnant. These remedies are concurrent or cumulative. Actions of the kind have long been recognized by the bar of this State. The test of inconsistency of remedies is that a certain state of facts relied on as the basis of a certain remedy is inconsistent with, and repugnant to, another state of facts relied on as the basis of another remedy. It means the assertion of one remedy negatives another. In the instant case the complainant might ask for judgment on the money sent for investment and at the same time properly ask that a lien be declared on property in which this money was invested. If the judgment is satisfied the lien would likewise be satisfied—it is the satisfaction that operates as a bar. See Grizzard v. Fite, 137 Tenn. 103,

191 S. W. 969, L. R. A. 1917D, 652; 18 Am. Jur., pages 134-136.

It seems to us that a close analogy is presented by those cases which involve the foreclosure of a mortgage and the suit on the note secured thereunder. The remedy here sought is cumulative and consistent.

We are convinced that the claim of the complainant is not barred by any of the various limitation statutes referred to in the brief and in argument. Code 1932, secs. 8582, 8600, 8601.

Albert, the trustee, does not rely on any such defense. The limitation is plead and relied on by his wife. Her only right to the property is through her marriage to Albert. At most she now becomes a potential creditor of his; i. e., when they separated at or about the time this action was commenced. "The prevailing view seems to be that since the defense of the statute of limitations is personal to the debtor, a plea of limitations may not be interposed by a creditor upon his debtor's behalf." 34 Am. Jur., page 298, sec. 384.

These defendants invested this money of the complainant in property which was in one of the defendant's name and then the defendants jointly received the benefits derived from the improved property. They were never holding adversely to the complainant. The husband frequently admitted the property was improved with his sister's money. The wife was well aware of this fact. Their holding is very analogous to that of tenants in common. The holding of one tenant in common is the possession of all unless the one holding claims to hold exclusively for himself. Woodruff v. Roysden, 105 Tenn. 491, 494, 58 S. W. 1066, 80 Am. St. Rep. 905.

It is generally held that the statute of limitations does not start to run in the case of a resulting trust until the trustee does some act hostile to the cestui. Bogert, Trusts and Trustees, vol. 4, sec. 952, page 2764. The reasoning is that the trustee is friendly and holds for the cestui with his knowledge and therefore until the trustee does something adverse there would be no reason to assert a right. This same reasoning would certainly seem to apply more strongly here where the improvements were made and it was repeatedly said they were for the sister.

In the case of a constructive trust the statute begins to run from the date when the wrongful and adverse holding begins and is, or should be, known to the complainant. Haynie v. Hall's Ex'r, 5 Humph. 290, 42 Am. Dec. 427; Haynes v. Swann, 6 Heisk. 560.

The sister knew of this holding by the brother but there was no adverse holding or acts in so far as she was concerned. He says this was for her. The wife who now undertakes to set up the statute was sharing with her husband. She should not be allowed to share in the benefits and then use her acts to defeat the rights of the sister which are paramount.

The chancellor declared a lien on the properties, subject to the lien of the blanket mortgage, and said "the money was invested in these three properties created a resulting trust thereon." The use of the term "resulting trust" is a wrong appellation except as to the lot which was purchased with the complainants' money. Calling the trust by the wrong name will not affect the matter so long as he reached the correct result. The term has been variously used in our older reported cases.

"A distinguished writer in this field has suggested that a more logical classification of trusts would be to group

them as either 'intent enforcing' or 'fraud rectifying.' Within the former class would fall: (1) Cases where the settlor has by words clearly expressed an intent to have a trust exist; (2) cases in which the settlor has expressed in words an ambiguous intent, which the court examines and finds to be a trust intent; and (3) cases in which the settlor has expressed no intent by words, but in which he has done acts other than talking or writing from which the court finds an intent that a trust arise. In this latter class would fall what are usually called resulting trusts. To the second class, that of ''fraud rectifying,' would be assigned those relations usually classed as constructive or involuntary trusts, in which the parties have expressed no intent to have a trust, nor does the court infer or presume that any such intent existed, but the court uses the trust terminology as the most convenient method for working out justice and preventing one party from unjustly enriching himself at the expense of the other.'' Bogert, Trusts and Trustees, vol. 2, sec. 451, page 1346.

■■ To create the inference of a resulting trust the money must be paid at or before the purchase of the real property. If made afterward it must have bene done pursuant to an obligation entered into prior to the purchase. The spending of money on property already owned will not create a resulting trust. The fundamental principle back of a resulting trust is that the law will infer or presume or create a trust if parties put themselves in certain situations. The evidence to establish any one of these trusts must be ''full, clear, convincing and satisfactory.''

■ In the instant case the evidence answers this requirement. This money was sent by the sister to invest. It was no gift; it was not a loan to him; he

invested it for her largely on property he already owned. It could not be called a resulting trust, except as to the money used in the purchase of one lot. We think the majority of this money should 'come under the second classification of the above quotation. A constructive trust has been variously defined as, ''the formula through which the conscience of equity finds expression. When property has been acquired in such circumstances that the holder of the legal title may not in good conscience retain the beneficial interest, equity converts him into a trustee. . . . A court of equity in decreeing a constructive trust is bound by no unyielding formula. The equity of the transaction must shape the measure of relief.'' Cardozo, J., in Beatty v. Guggenheim Exploration Co., 225 N. Y. 380, 386, 389, 122 N. E. 378, 380.

''A constructive trust is one not created by any words either expressly or impliedly evincing a direct intention to create a trust, but by the construction of equity in order to satisfy the demands of justice. . . . They are entirely in invitum and forced upon the conscience of the trustee for the purpose of working out right and justice or frustrating fraud.'' Motley's Adm'rs v. Tabor, 208 Ky. 702, 706, 271 S. W. 1064, 1065.

It is frequently necessary for courts of equity to thus apply the principle above enunciated in dealings between parties who occupy a close relationship. In a close relationship as was between this brother and sister it was natural for her to trust him by letting down all guards and bars.

The case of McCall v. Flippin, Adm'r, 61 Tenn. (2 Baxt.), 161, has been referred to in brief and argument. The opinion dismisses the action because there was no resulting trust created as hereinabove defined. A foot-

note to this case says that the court of its own motion reversed this opinion. The authority for this reversal is given as Gannaway v. Tarpley, 41 Tenn. (1 Cold.), 572. The Gannaway case is a constructive trust case—not a resulting trust case. Apparently the court in the McCall case later reached the conclusion that the facts of that case warranted their construing it as a constructive trust though the opinion is otherwise.

For the reasons herein expressed the decree of the lower court will be affirmed, with costs.

Hale & McAmis, JJ., concur.