NEW YORK LIFE INSURANCE COMPANY

*v.*

NASHVILLE TRUST COMPANY et al.

(*Nashville,* December Term, 1955.)

Opinion filed April 27, 1956.

Rehearing Denied July 20, 1956.

514

J. C. Edwards, Nashville, Chambliss, Chambliss & Brown, Chattanooga, for appellant.

Hooker, Keeble, Dodson & Harris, Howard, Davis, Boult & Hunt, James A. Newman and Norvell & Minick, Nashville, for appellees.

Prewitt and Swepston, Justices, dissented.

Mr. Justice Burnett delivered the opinion of the Court.

The bill in this cause was filed by the Insurance Company against the Trust Company and others, as defendants, seeking to recover of the Trust Company certain funds which it holds as successor trustee to the Nashville Trust Company, which was the beneficiary under two life insurance policies, as described in the bill, issued on the life of Thomas C. Buntin and payable to the Nashville Trust Company as trustee under a trust instrument dated February 16, 1928.

The beneficiaries under the trust agreement are made individual defendants to this suit and are the former wife of Thomas C. Buntin and their three children.

Thomas C. Buntin, the insured, who was likewise an insurance man, disappeared from his home in Nashville, Tennessee, and subsequently a suit was brought by the Nashville Trust Company against the complainant Insurance Company, appellant, in which a judgment was rendered against the Company for the full amount of the policies. This case is reported in 178 Tenn. 437, 159 S.W. 2d 81, and is styled, *New York Life Insurance Company v. Nashville Trust Company*. As a result of this suit, on March 10, 1942, the Insurance Company paid to the trustee $59,438.40, from which certain expenses and costs were paid and the net balance paid to the trustee and later turned over to the successor trustee, defendant in the present suit.

Thomas C. Buntin, the insured upon which that money was paid, was found alive on June 3, 1953, and his identity verified June 12, 1953. This suit was brought immediately thereafter and is for the purpose of recovering the net balance of the funds in the hands of the successor trustee.

The relief sought in this suit is based on five grounds: (1) mistake, (2) fraud, (3) that the defendants have been unjustly enriched, (4) newly discovered evidence and (5) that the defendant trustee holds the funds in its hands as constructive trustee for the Insurance Company.

To this bill the defendants demurred which with the original and amended demurrers substantially raised these points, to wit:

1. That whatever right of action the complainant has is barred either by the six or ten year statute of limitations;

2. That the judgment in the Circuit Court action between the same parties is *res judicata* on the merits;

3. That no actionable mistake has been made;

4. That all facts as to fraud were in the original proceeding and cannot be attacked in this proceeding;

5. That there are not sufficient allegations of fraud pleaded;

6. That no facts are pleaded which show a mistake;

7. That there is no charge of fraud against either the trustee or beneficiary.

The Chancellor sustained the defendant's demurrers and dismissed the bill. He kept in force an injunction to enjoin the successor trustee from paying out the money pending this litigation. An appeal has been seasonably perfected, able and excellent briefs have been filed and arguments heard. We now have the matter for determination.

In this case, after much study and thought, we think the demurrers should have been overruled. We think that the fraud committed here by Buntin is extrinsic. True, it is very closely allied to what is known as intrinsic fraud wherein all the courts, insofar as we have been able to find, have followed *U. S. v. Throckmorton,* 98 U.S. 61, 25 L.Ed. 93; *Pico v. Cohn,* 91 Cal. 129, 25 P. 970, 27 P. 537, 13 L.R.A. 336. We are committed to this rule if the fraud is intrinsic as is shown by *Keith v. Alger* 114 Tenn. 1, 85 S.W. 71. We feel though that fraud in the instant case, for the reasons hereinafter stated, more or less brings it within the rule of *Hazel-Atlas*

518

*Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238, 64 S.Ct. 997, 88 L.Ed. 1250, wherein the well-recognized rule of the Throckmorton case and others was recognized again by the Supreme Court of the United States.

In the first place it is conceded by all that the money now sought by the appellant is money being held by a successor trustee growing out of a lawsuit of *New York Life Insurance Company v. Nashville Trust Company* as reported in 178 Tenn. 437, 159 S.W.2d 81. This money was paid on a contract that Thomas C. Buntin had with the Life Insurance Company wherein they agreed to pay the principal amount of these policies "upon receipt of due proof of the death of Thomas C. Buntin". As is shown by the reported opinion, which was prepared by the late Chief Justice Grafton Green, the proof in that lawsuit and the inferences there along with the seven-year presumption statute, (which is simply the common-law rule of evidence and has no more force than any other evidence which might turn out to be untrue, *D'Arusment v. Jones,* 72 Tenn. 251) warranted this Court, in that case, in finding under such circumstantial evidence that the insured died prior to March 8, 1933, the expiration date of the insurance. In that case great weight and great store was put on the fact of the wills being sent home from St. Louis to two of his relatives; the unstability of Buntin himself; the suicide of Buntin's father and things of that kind which clearly convinced this Court, in that lawsuit, that Buntin was dead.

It now, twenty years after the policies had matured in 1933, turns out that Buntin is alive, is married again and is raising another family. The trial court in the reported case did not consider that Buntin was committing any fraud on them. The question there was whether or

not Buntin was dead. Under the facts and circumstances introduced in that case the court and jury, affirmed by the appellate courts as was shown by the reported opinion, concluded that he was dead. It is true that the Insurance Company offered certain proof to the effect that he had been seen here and there (all of which later turned out to be incorrect), but this was not a showing of fraud, it was merely a showing or an attempt to show, that subsequent to the time that the policies lapsed, Buntin was seen alive. It now turns out that he has committed a *gross fraud upon the Court* as well as upon the Insurance Company. By his acts then, which no one knew anything of until twenty years later and after this judgment became final, he fooled this Court and caused it to reach a mistake of fact (that Buntin was dead) when as a matter of fact he was alive.

In 31 Am.Jur., Sec. 654, page 232, it is said:

"Fraud which induces an adversary to withdraw his defense, or *prevents him from presenting an available defense* or cause of action in the action in which the judgment is obtained, has been *regarded as a proper ground* for equitable relief against the judgment." (Emphasis ours.)

There are then cited a number of cases from many jurisdictions in the United States. In this instant case Buntin by hiding out committed a fraud on this Court and by his action prevented the available defense to the Insurance Company that he was actually alive. This was not discovered until 1953.

The United States Supreme Court has very recently, in *Hazel-Atlas Glass Co. v. Hartford-Empire Co., supra* [322 U.S. 238, 64 S.Ct. 1000], said:

"But where the occasion has demanded, where enforcement of the judgment is *'manifestly unconscionable'*, *Pickford v. Talbott*, 225 U.S. 651, 657, 32 S.Ct. 687, 689, 56 L.Ed. 1240, they have wielded the power without hesitation. [This statement in the opinion which is now quoted follows a recognition of the rule of the Throckmorton case and other related cases.] * * *

"Every element of the fraud here disclosed demands the exercise of the historic power of equity *to set aside fraudulently begotten judgments*. This is not simply a case of a judgment obtained with the aid of a witness who, on the basis of *after-discovered evidence, is believed possibly to have been guilty of perjury.* Here, even if we consider nothing but Hartford's sworn admissions, we find a deliberately planned and carefully executed scheme to defraud not only the Patent Office but the Circuit Court of Appeals. Cf. *Marshall v. Holmes,* [141 U.S. 589, 12 S.Ct. 62, 35 L.Ed. 870] *supra.* Proof of the scheme, and of its complete success up to date, is conclusive. Cf. *United States v. Throckmorton, supra. And no equities have intervened through transfer of the fraudulently procured* patent or judgment *to an innocent purchaser.* Cf. Ibid; *Hopkins v. Hebard,* 235 U.S. 287, 35 S.Ct. 26, 59 L.Ed. 232.

"* * * Furthermore, tampering with the administration of justice in the manner indisputably shown here involves far more than an injury to a single litigant. *It is a wrong against the institutions set up to protect and safeguard the public, institutions in which fraud cannot complacently be tolerated consistently with the good order of society. Surely it cannot be that preservation of the integrity of the judicial proc-*

*ess must always wait upon the diligence of litigants.* The public welfare demands that the agencies of *public justice be not so impotent that they must always be mute and helpless victims of deception and fraud."* (Emphasis ours.)

This was a suit wherein the Supreme Court of the United States set aside a judgment, or authorized the Circuit Court of Appeals to or directed them to, which judgment had been entered by them some ten years prior thereto and the term had expired, etc., which brought the judgment as contended under the rules of the Throckmorton case and others. The bill was filed to set aside the judgment as having been obtained by fraud. The fraud consisted of a conspiracy entered into by the attorneys and officials of one of the companies to have published in a trade journal an article which would describe the process under consideration as a remarkable advance in the art of fashioning certain glass machinery. The Circuit Court on the strength of this article held that the patent was valid and the District Court was reversed. At the time the matter was tried in the District Court the Hazel-Atlas Glass attorneys received information that one Clark and one of Hartford's attorneys had several years previously admitted that the Hartford lawyer was the true author of the publication. Hazel-Atlas attorneys did not at that time attempt to verify the truth of the hearsay story but relied on and won the case on other grounds. After the Circuit Court opinion reversed the District Court on this ground, investigation was made which determined the true state of affairs. The mandate of the Circuit Court was entered in 1932. In 1941 the present suit, just quoted from above, was commenced with the result that due to the fraud therein committed

the suit was reversed. Picture the related acts of Buntin in this case and the facts of the case just quoted from. We cannot see that the fraud in the case last above quoted from is as extrinsic as is the fraud in the instant case, Buntin case. *The fraud of Buntin was not discovered until many years after the money was paid and the judgment was rendered and it was this fraud which was discovered later on that is now the question. That fraud was not before the Court and is not the basis of the opinion as heretofore reported.* 178 Tenn. 437, 159 S.W.2d 81.

The rationale of these decisions, the Throckmorton and Pico, is that in the course of a trial the adversary has the opportunity by a cross-examination to show perjury or forgery and that in every case there is likely to be a difference of opinion among the witnesses which may be shown by rigid cross-examination. The rationale further is that where there has been a fair trail, the parties have had a fair opportunity to present the situation, then the final judgment is final and cannot be reopened for very good and obvious reasons. *But in the instant case there was not a fair and honest opportunity to present things which were discovered twenty years later.* No one would doubt certainly, if it could have been discovered at the time this case was originally tried, that Buntin was alive that there would have been any judgment rendered in it then. We would guess that if Buntin had been found then he would have been held in contempt of Court to the limit of its severity. Is it right that he can now come in court, years later, and say: "Well, I've got your money, do what you want to about it, there is nothing you can do with me about it or anything else". Is it right then that someone else, that he has made bene-

ficiary under his policy, should keep this money? It certainly seems to us that it should go back where it belongs, that part which is left and that those who are not entitled to it should not be allowed further to participate in it.

It was argued here by the appellees that no fraud has been committed. We cannot imagine how acts could be more fraudulent. This Court, a long time ago, in *Smith v. Harrison,* 49 Tenn. 230 said:

"Fraud vitiates and avoids all human transactions, from the solemn judgment of a court to a private contract. It is as odious and as fatal in a court of law as in a court of equity. It is a thing indefinable by any fixed and arbitrary definition. In its multiform phases and subtle shapes, it baffles definition. It is said, indeed, that it is part of the equity doctrine of fraud not to define it, lest the craft of men should find ways of committing fraud which might evade such a definition. In its most general sense, it embraces all 'acts, omissions, or concealments which involve a breach of legal and equitable duty, trust or confidence justly reposed, and are injurious to another, or by which an undue and unconscientious advantage is taken 6f another.' 1 Bouv.L.D., page 613. A judicial proceeding in rem, while generally binding upon all persons, is no more free from the fatal taint of fraud than a proceeding in personam, or an individual contract. When once shown to exist, it poisons alike the contract of the citizen, the treaty of the diplomat, and the solemn judgment of the court."

Buntin hid out so he could not be found and stayed in this way for many years. It is obvious of course that he knew these insurance policies were in existence, he is certainly presumed to have known so. He had the right

to change the beneficiaries on these policies when he wanted to; he did change this shortly before he left, leaving them payable to a trust company for the benefit of his wife for life and then to her children. Then after twenty years or thereabouts his fraud was discovered. This was *after-discovered fraud*, when he was actually found alive, and it seems to us for this kind of fraud, *when there was no opportunity to show this in the trial nearly twenty years before, that clearly equity should grant relief against judgments obtained by such a fraud which are not really discovered until twenty years later. Our Courts, this very Court, was imposed upon and fooled and defrauded* by Buntin being hidden out into rendering an opinion upon which fifty-odd thousand dollas in money was paid. Under the circumstances here we go along with the Kentucky Court when it said:

"* * * technicalities of interpretation or refinement of distinction should not and will not be permitted to embarrass the court in exercising its power to do justice." *Metropolitan Life Ins. Co. of New York v. Meyers*, 270 Ky. 523, 109 S.W.2d 1194, 1198.

██ ██ Clearly the plea of *res judicata* should have been overruled. The issue in the case now is whether or not Tom Buntin by active extrinsic fraud has defrauded the Courts and the Insurance Company, thereby causing the Courts to say that money should be paid to the beneficiaries of Buntin. And also that by his deliberately and wilfully keeping himself hidden out he has simulated death and has manufactured a chain of circumstances and evidence which was calculated to and did persuade the Courts of this State that he had committed suicide. In the case heretofore tried the issue was whether or not under the facts there he was dead. The issue in the

law case decided twenty-odd years ago was "whether or not Buntin had died prior to March 8, 1933, (the date the policy expired without value) was the issue in the previous trial". It certainly seems to us that this is an independent action and does not involve any retrial of the issues disposed of in the former case. We think this question is directly determined in *Copeland v. Copeland,* 180 Tenn. 609, 177 S.W.2d 555, wherein this Court, speaking through Mr. Chief Justice Green, said:

"A plea of *res judicata* is not available merely because the subject matter of two suits is the same. The cause of action in the two suits must be the same. Mr. Freeman expresses the rule thus:

" 'As we have already seen, identity of subject matter is not essential to estoppel by judgment. So in determining whether causes of action are the same, the identity of the subject matter or of the transaction out of which they arise, is not a controlling factor. The subject matter of an action must be distinguished from the cause of action, since the subject matter of the two actions may be the same and yet the causes of action may be entirely different. New rights in the same subject matter may intervene between the two actions.' Freeman on Judgments, Fifth Edition, p. 1434."

And then too, it is well said:

"* * * it is generally held that the principles of *res judicata* may not be invoked to sustain fraud, and that a judgment obtained by fraud or collusion may not be used as a basis for the application of the doctrine of *res judicata.*" 30 Am. Jur. (Judgments) 202, p. 941.

We are satisfied that under the authorities in this State a constructive trust should be set up to take the

money which is in the court and apply it where it rightfully belongs. The obligation under the insurance contract upon which the money was recovered was an obligation to pay upon the death of Buntin. Buntin is not dead, and the only reason the money was paid was because of the fraud committed by him against the Courts and against the Insurance Company. It seems to us therefore that the trustees now holding this fund now hold it due to the *unconscionable conduct and active fraud* on the part of Buntin. It seems to us that thus a constructive trust should be placed upon the fund.

Under an analogous situation the Circuit Court of Appeals for the Ninth Circuit in the case of *Brown v. New York Life,* 152 F.2d 246, 250, said this:

"Appellant paid nothing for the insurance policies and as to her they were a gratuity. She is innocent of fraud perpetrated by herself, but as the lower court pointed out, even the widow of a trustee *ex maleficio* who has paid no consideration for the property purchased with misappropriated funds, or for their fruits, may not hold such property, or the fruits thereof, against the *cestui que* trust, who is the real owner. A third person, unless he or she has in good faith acquired for value without notice a subsequent interest, seeking any benefit resulting from the misappropriation, becomes a *particeps criminis* however innocent of the fraud in the beginning." Citing as authority therefor, *Story's Equity Jurisprudence,* 14th Ed., and *Perry on Trusts* and the case of *Vorlander v. Keyes,* 8 Cir., 1 F.2d 67.

This is sound. Our cases of *Akers v. Gillentine,* 191 Tenn. 35, 231 S.W.2d 369 and *Fehn v. Schlickling,* 26

Tenn.App. 608, 175 S.W.2d 37, will support such a constructive trust out of the funds here held.

■■ We are likewise very confident that the statute of limitations did not run herein. The fraud of Buntin was not known until he was found in 1953.

"Most of the cases treating of the bearing of the statute of limitations upon the right to a constructive trust have recognized the soundness of the principles above stated and have applied the statute from the date of actual or imputed knowledge by the *cestui* of the wrongful holding." 4 Bogert on trusts, sec. 953, p. 213; *Haynie v. Hall's Executor*, 24 Tenn. 290, 42 Am. Dec. 427; *Haynes v. Swann*, 53 Tenn. 560 and in *Akers v. Gillentine, supra.*

The case relied on by the appellee of *New York Life Ins. Co. v. Chittenden & Eastman*, 134 Iowa 613, 112 N.W. 96, 99, 11 L.R.A.,N.S., 233, is not in point. We quote briefly from that case:

"In the case before us the question whether Jarvis was dead was distinctly within the contemplation of both parties for it was expressly recited in the proof of loss that he had been absent for more than seven years, and had not been heard of within that time. The only question of controversy between the parties in determining whether or not the insurance money should be paid was as to whether Jarvis was dead, and the plaintiff conceded its liability by voluntarily paying the claim. *In the absence of fraud or concealment, the means of knowledge as to the fact in controversy being equally accessible to each party, the payment is conclusive.*" Emphasis ours.

528

Thus it is seen that there was no fraud or concealment or anything of that kind in the Iowa case—it was merely a voluntary payment.

The case of *Steele v. Metropolitan Life Ins. Co.*, 196 N.C. 408, 145 S.E. 787, 61 A.L.R. 821, is likewise cited as authority. This case, too, is no authority for the position of the appellee. The only thing involved in this case was whether or not the lower court had the power to impose upon the beneficiaries under a policy the giving of bond to get the money upon the presumptive proof of death of seven years. Otherwise the case is exactly the same as a reported case herein in 178 Tenn. It is not authority at all for the proposition now before us.

The case of *Mays v. Sovereign Camp, etc.*, 151 Tenn. 604, 271 S.W. 34, 40 A.L.R. 1266, is likewise not in point here. The question involved in that case was whether or not when an insurance company has provided that the presumptive seven-year period of death shall not apply until the full expectancy has expired was against public policy. This Court held that the insurance company could so provide and it was not against public policy.

*The Insurance Company did not have to provide in its contract against fraud being committed on it or fraud being committed on a court. That is what the courts are here for,* if fraud is committed *we are to protect the rights of those that are defrauded.*

So, it is for these reasons that we think the demurrers should have been overruled. The case is reversed and remanded for further proceedings consistent with this opinion. The costs of the case are to be paid out of the funds in the hands of the trustee.

PREWITT and SWEPSTON, JUSTICES, dissent.

TOMLINSON, JUSTICE (concurring).

I am in accord with the opinion written for the majority by Mr. Justice Burnett. But there is one point which I would like to emphasize. Hence, this concurring opinion.

All must agree, it seems to me, that the true intent of the contracting parties was that the insurance money provided for by the insurance contract would be payable only if Buntin died during the life of the policy. By reason of Buntin's fraud, the Court was tricked into requiring the Insurance Company to pay this insurance on a finding that Buntin did so die. It is now admitted that he is living, and that some $30,000 of this money is in the possession of those beneficiaries who were not parties to the fraud, but whom Buntin intended to benefit by means of his fraud.

The only difficult question, as I see it, is whether the fraud of Buntin is so intrinsic as to defeat the suit of the Insurance Company in these subsequent independent proceedings instituted to procure a return of what is left of that money.

If the fraud amounts to nothing more than false evidence introduced to establish the affirmative or the negative of the issue which the Court is to determine, it is intrinsic, of course. Perjury or a forged signature, nothing else appearing, would fall within this category. But, as said in the majority opinion, there exists in such situations a fair opportunity for the introduction of testimony contradictory of such perjured testimony, and by cross-examination there is afforded an additional opportunity to expose the fraud.

On the other hand, if the fraud is of a character which has prevented the defrauded litigant from interposing

the only defense available in the suit, it is extrinsic fraud for which—nothing else in the way—the defrauded party may recover in an independent subsequent chancery proceedings, as I understand the law.

The fraud may be of a kind so close to the line of demarcation between intrinsic and extrinsic as to make it difficult to determine upon which side of the line the fraud in question falls. Some acts of fraud may possess characteristics coming within the definition of each. In that plight, the intrinsic fraud characteristics ought not to prevent a Court of equity in a subsequent independent proceedings from ordering the return to the defrauded party of the property of which he was defrauded, and of which the beneficiary of that fraud is still in possession, if, in fact, the defrauded party was deprived by the peculiar nature of the fraud in question of its only available defense. That this is a correct rule of law seems to be made clear by 49 C.J.S., Judgments, sec. 372, pages 740-742, in its discussion of extrinsic fraud, wherein it declared the rule to be that

"the fraud must not be something which was actually or potentially in issue in the case, *unless the interposition of the defense was prevented by fraud or conduct of the opposite party.*" (Emphasis supplied.)

Keeping that rule in mind, let it now be recalled that this is not a case wherein a party simply disappeared and was unheard of by those who would be expected to hear, etc., for a period of seven years. There was no cause of action against this Insurance Company, unless Buntin died within the life of the policy; that is, within eighteen months after his disappearance. Almost immediately after his evilly conceived, self-made surreptitious

disappearance, Buntin concocted a cause of action by very cleverly simulating the occurrence of suicide.

That simulation of suicide was, per se, evidence of his death, and, under the circumstances related in the decision of this Court in the former suit, almost conclusively required a finding that Buntin died while the policy was in force, unless the Insurance Company could show that he still lived. The concocted evidence being what it was, that was the only defense available to the Insurance Company. The decision in 178 Tenn. 437, 159 S.W.2d 81, discloses the fact that the Insurance Company unsuccessfully did everything within its power to find Buntin, for it was convinced, apparently, that his suicide was simulated.

Buntin, however, having concocted a cause of action against the Insurance Company, and, by the same token, having furnished evidence conclusive in support thereof unless his live body (or the equivalent by proof) could, in effect, be produced, then did cleverly and cunningly set about not only to furnish more evidence in support of the bogus cause of action, but, in addition, to deprive this Insurance Company of the only defense available to defeat it. He did this by devices which completely concealed his whereabouts, his identity, or the fact that he existed. He did not just disappear for more than seven years. He deliberately and successfully made it appear by the fraudulently conceived devices mentioned that he had died almost at the beginning of that seven-year period. This was fraud deliberately conceived to prevent the Insurance Company from interposing its only defense, to the end that it, the Insurance Company, would be ''fleeced'' of its money for the benefit of the wife and children whom he was deserting.

This premeditated and perfectly executed scheme did deprive the Insurance Company of its only available defense. In that sense, therefore, it was extrinsic as well as intrinsic fraud. And being such, the Insurance Company is entitled for all the reasons set out in the majority opinion to maintain this suit, I think.

NEIL, CHIEF JUSTICE (concurring).

This case has given me the greatest concern due to its importance, and the fact that the issue, whether the fraud involved is *intrinsic or extrinsic*. My tentative view at the beginning was (1) that it was intrinsic and fell within the category of judgments that had been obtained by false testimony; and (2) that since the complainant had it within its own power to contract against the fraud of the insured the Chancery Court could not grant the relief prayed for. In other words, the complainant was not privileged to invoke the jurisdiction of the court to protect it from its own folly in not guarding against the wrong complained of.

Upon a thorough examination of the authorities, and especially the excellent briefs of counsel, I feel constrained to disagree with the able Chancellor and to concur with Justices Burnett and Tomlinson that the fraud practiced upon the New York Life Insurance Company was both intrinsic and extrinsic. If it were a case of intrinsic fraud, the court would clearly have no jurisdiction of the case. But if it were otherwise, i. e. intrinsic and extrinsic, and the money out of which the complainant was defrauded is within the reach of the Chancery Court, then the court should require restitution of the fund under the equitable doctrine of a constructive trust which arises for the benefit of the one who is defrauded.

The beneficiaries of the insurance contracts, and who have been enriched by the fraud of Buntin, the insured, have no legal or equitable claim upon this fund even though no wrong is imputed to them. It is said by Mr. Gibson, *Gibson's Suits in Chancery,* 3rd Ed., Section 33, "any wrong done to a legal or equitable right will be redressed in Equity, unless some other Court has exclusive jurisdiction."

In the instant case the counsel for the complainant rightfully contends that "this money belongs to the New York Life Insurance Company" because of the gross fraud of the insured. In *Pomeroy's Equity Jurisprudence,* 5th Ed., at Section 155, it is said:

"If one party obtains the legal title to property, not only by fraud or by violation of confidence or of fiduciary relations, but in any other unconscientious manner, so that he cannot equitably retain the property which really belongs to another, equity carries out its theory of a double ownership, equitable and legal, by impressing a constructive trust upon the property in favor of the one who is in good conscience entitled to it, and who is considered in equity as the beneficial owner."

It is my well-considered opinion that the court should decree that the money now in trust should be held for the benefit of the New York Life Insurance Company. The beneficiaries will suffer no injury as a result of a decree sustaining the complainant's bill, because the money *is not theirs to retain as a matter of legal or equitable right.*

The complainant has appealed from an unyielding rule of the common law to the great forum of conscience. The High Court of Chancery was erected, and has continued

to exist, for the purpose of doing justice where there is no adequate remedy at law. It is said by Pomeroy, and recognized by universal authority, "*Constructive trusts are raised by equity for the purpose of working out right and justice.*" Section 155. Moreover we are ever reminded by pronouncements of a great truth "that Equity delights in doing justice." And what is justice? It was defined by Ulpian, the great Roman, centuries ago; "*Justice is the constant and perpetual will to allot to every man his due.*" Dean Wigmore in his "Panorama of the World's Legal Systems" speaks of Ulpian as "the author of that lofty definition." It is upon this principle that I rest my decision in this case.

I concur with Mr. Justice Burnett that the complainant should not be repelled from court on the ground that it is deprived of the court's jurisdiction to frustrate a fraud because in issuing the policy it failed to make provision against the fraud that was practiced upon it. It would result in refusing relief in all cases of fraud wherein the complaining party had failed to take notice of it in the contract and make express provision against it. It is fundamental to every contract that "Neither party has done, nor will do, anything to hinder, delay or defeat a faithful compliance with the contract on his part." *Gibson's Suits in Chancery*, 3rd Ed., Section 932.

For the foregoing reasons I feel constrained to hold that the complainant's bill should be sustained.

SWEPSTON, JUSTICE (dissenting).

My dissent in this case is based solely upon that part of the majority opinion which relates to the question of whether this fraud was intrinsic or extrinsic.

I think the majority opinion reflects a great deal of study on the part of the writer and I think his conclusion would be justified by the opinion in the Hazel-Atlas Glass Company, decided by the United States Supreme Court, except that it is out of line with our own case. I am of the opinion, however, that the majority opinion opens up Pandora's Box of troubles in that the stability of judgments will be destroyed. In the case above referred to, as stated in the majority opinion, the fraud consisted of a conspiracy entered into by the attorneys and officials of one of the companies to have published in a trade journal an article which would describe the process under consideration as a remarkable advance in the art of fashioning certain glass machinery. The Circuit Court of Appeals on the strength of that article held that the patent was valid. Thus it clearly appears that this fraud entered into the judicial process of the court in reaching its judgment. Therefore under all of our authorities in Tennessee it was intrinsic evidence. *Thomas v. Dockery,* 33 Tenn. App. 695, 702, 703, 232 S.W.2d 594, 598. "Extrinsic fraud is said to consist of conduct or occurrences extrinsic or collateral to the issues examined and determined in the action", as distinguished from those things which are a part of the internal chain composing the process of adjudication.

Likewise the fraudulent conduct of Buntin in setting the stage to make it appear that his death had occurred was intrinsic evidence because, although the Insurance Company offered evidence to the contrary, this Court reached the conclusion on the strength of Buntin's very conduct among other things that he was in fact dead.

It is suggested by one member of the Court that the evidence in the instant case is both intrinsic and ex-

trinsic. According to the above definition of the two it is impossible for such a statement to be correct. The evidence is extrinsic in the sense that it occurred outside the courtroom but that is not within the definition of extrinsic evidence; it must be extrinsic because it was conduct or occurrences collateral to the issues examined in Court.

I am unable to see any difference between the fraudulent newspaper article in the Hazel-Atlas Glass case and the case of the forged document in any other case, or for that matter perjured testimony arising out of the subornation of a witness by the party to the suit. There is a rather weak and hazy statement in the opinion in the Hazel-Atlas Glass case where the Court said [322 U.S. 238, 64 S.Ct. 1001]: "This is not simply a case of a judgment obtained with the aid of a witness who, on the basis of after-discovered evidence, *is believed possibly to have been guilty of perjury.*" The trouble with that statement is that there are many cases of after-discovered evidence where there is absolutely *no question that perjured testimony* entered into the case, or no question that a document was forged. There was therefore no more justification for setting aside the judgment in that case above referred to on account of the admittedly false newspaper item than there would be in any other case where it unequivocally appeared after the decision or trial that the successful party had suborned witnesses or had procured forged documents that entered into the chain of circumstances leading to the formation of the court's judgment.

This Court is not bound to follow the decision of the United States Supreme Court in a question of this nature and to do so is to go contrary to all of our cases treating of the distinction between intrinsic and extrinsic evi-

dence and in effect to abolish the distinction in Tennessee, the result of which would destroy the repose of judgments and open up the floodgates of litigation designed to set aside former judgments on the ground that same were procured by alleged extrinsic fraud when in fact the fraud was according to all our definitions intrinsic.

For these reasons I am of the opinion that we should let the dead past bury its dead, as in fact Thomas Buntin was dead within the contemplation of the insurance contract and the laws of Tennessee.

In conclusion I am of opinion that the bill should have been dismissed on this ground alone. Otherwise I have no fault to find with the majority opinion.

PREWITT, JUSTICE (dissenting).

The questions herein presented are ones of law raised by the demurrer, the grounds of which are in substance as follows:

(1) That the former judgment is *res adjudicata,* and is conclusive as to the death of Buntin by reason of his unexplained absence for a period of seven years; (2) that the present suit is barred by the six and ten year statutes of limitations; (3) that the facts averred as fraud in this cause were considered in the former suit and determined adversely to complainant, and there are no facts of fraud charged against the defendants as trustees or beneficiaries, and the alleged fraud of Buntin is not attributable or imputable to said defendant; (4) that no facts are averred which would justify a trust being imposed upon the funds held by defendant Bank, and that said funds are being held as a result of a valid judgment since the date of payment on March 10, 1942, have been held adversely to complainant and any action

by it is barred by the six and ten year statute of limitations; and (5) that the only alleged mistake was that the Courts erroneously concluded Buntin was dead, which mistake was intrinsic and foreclosed by the prior judgment as a direct issue in that cause, and likewise the only facts averred to be fraudulent are of intrinsic fraud and foreclosed by the judgment in the former cause.

Now there can be no doubt that the Chancery Court has a right to grant relief against judgments which have been obtained through fraud, accident or mistake. See Gibson's Suits in Chancery, Fourth Edition, Section 814, page 659.

In this connection the complainant relies upon the case of *Fidelity Mutual Life Insurance Company v. Clark,* 203 U.S. 64, 27 S.Ct. 19, 51 L.Ed. 91. It appears that this was a fraud case, but the case relied on is distinguishable from the one at bar because the defendant beneficiaries herein are charged with no conspiracy or fraudulent acts whatsoever.

The principles set out above in Gibson's Suits in Chancery and also recognized in the case just cited above on this general proposition of jurisdiction is not controverted by the defendants, but it is contended by them even though the facts charged herein constitute fraud, the same would amount only to acts of intrinsic and not extrinsic fraud, and further under the principle of *res adjudicata,* the rights of the parties have been settled and this suit cannot be maintained.

The defendants contend that the Insurance Company, in the prior proceeding, took the position that Buntin voluntarily left Nashville to join a young woman, and undertook to prove that he was actually alive as late as January, 1935.

The defendants insist that where a fact had been judicially passed upon the factual question may not be reopened merely because it had been incorrectly decided in a former suit. See *King v. Vaughn,* 16 Tenn. 59; *Douglas v. Douglas,* 156 Tenn. 655, 4 S.W.2d 358, 359, wherein it was stated:

"Certain general principles are pertinent. We find in Bouvier's Dictionary the following definition of *res judicata,* given by Lord Hardwick, in *Gregory v. Molesworth,* 3 Atkins, 626, considered by some writers the best: 'When a question is necessarily decided in effect though not in express terms between parties to the suit, they cannot raise the same question as between themselves in any other suit in any other form.' "

Complainant insists that the fraud of Buntin was extrinsic in that he disappeared and deliberately kept himself away, and that as a result of his disappearance the Company as a defendant in the Circuit Court had no opportunity to meet the testimony of the beneficiaries because of the outside act of the insured. It is contended that his conduct was as much an extrinsic fraud as keeping the unsuccessful party, or a witness away from the court, both of which are recognized as extrinsic fraudulent acts.

The Court in the case of *Keith v. Alger,* 114 Tenn. 1, 24-25, 85 S.W.71, 77, after discussing the various cases involving extrinsic and intrinsic fraud said:

"It is perfectly clear that no one should be allowed to enforce a judgment which was procured by any of the fraudulent practices catalogued in *Pico v. Cohn, supra* [*Pico v. Cohn,* 91 Cal. 129, 25 P. 970.], and *United States v. Throckmorton, supra* [98 U.S. 65, 25 L.Ed. 93], or other similar fraudulent practices; but it

is equally clear that there must be at some time an end of litigation, and that the parties to a record, or the privies thereto, should not, in general, be allowed to retry the same issues after final judgment and the exhaustion of correctory and appellate proceedings. Carried to its ultimate, there would be no end to such retrials. The second case could be retried by a third, and the third by a fourth, and so on *ad finitum,* and nothing would ever be settled."

A still later case is *Thomas v. Dockery,* 33 Tenn. App. 695, 232 S.W.2d 594, 598, which recognizes the intrinsic and extrinsic fraud rule and relies upon *Keith v. Alger, supra.* The Court of Appeals make this statement:

"Under the ruling of the Keith case and by the weight of authority a judgment that has become final in the full sense of *res adjudicata* may not be set aside on allegation and proof of the falsity of the internal evidence, on which it was procured. See discussion in *Noll v. Chattanooga Company,* Tenn. Ch. App. 38 S.W. 287, 290; *Sharp v. Kennedy,* 13 Tenn. App. 170, 176.

"The reason for the rule is that litigation must be brought to a close; it would never terminate if each party successively could reopen the last judgment by charging false evidence."

The law, as pronounced by a majority of the cases, is that equity will not relieve for fraud which leads to an erroneous judgment after a trial which is otherwise fair, but only in cases where the party has been prevented from having a fair trial. But it seems that the intrinsic rule is only in the case where the party has been prevented from having a reasonably fair trial. Whether or not Buntin had died prior to March 8, 1933, was the issue on the previous trial. The company was not misled

by Buntin's disappearance, or the mailing of the will by him to his relatives.

The complainant has had its day in court, without any misapprehension or mistaken belief as to what the facts were, but it could not convince the Courts.

The insurance policies issued by complainant on Buntin's life constituted contracts between it and the designated trustee thereunder, whereby the Company agreed to pay certain amounts upon proof of death of the said Buntin.

The rule in Tennessee is to the effect that insurance companies may expressly protect themselves from the liability of presumptive death, created by unexplained absence, if they see fit to do so. In the case of *Mays v. Sovereign Camp W. O. W.*, 151 Tenn. 604, 620, 271 S.W. 34, 38, 40 A.L.R. 1266, it was said:

"An insurance company has a right to contract as to the nature and extent of the risk assumed, and we see no good reason why a benefit society, operated in the interest of its members and not for profit, cannot, by contract limit its liability to actual or physical death, or presumptive death after the period of life expectancy of the insured has expired. In other words, we see no reason why it cannot exclude, by contract, liability for a presumptive death; and no valid reason occurs to us as to why such a contract in any sense offends the public policy of the State."

In the case of *Redwine v. Metropolitan Life Insurance Company*, 178 Tenn. 83, 156 S.W.2d 389, the question arose as to whether or not the proceeds of a certain policy of insurance were payable to a named beneficiary, or to the estate of the deceased. The named beneficiary

had disappeared and remained away for more than seven years. The company was insisting upon the right to have the estate of the deceased put up an indemnity bond to protect it in the event that the named beneficiary appeared and claimed the benefits of the policy. This Court said 178 Tenn. at page 85, 156 S.W. 2d at page 390:

"The common law presumption of death from disappearance for seven years is well established. 25 C.J.S., Death, sec. 6, page 1055, and 16 Am. Jur., Death, sec. 24, page 23. The Insurance Company drafted the policy knowing this rule. Language requiring a bond could have been inserted. See *Mays v. Sovereign Camp,* 151 Tenn. 604, 271 S.W. 34, 40 A.L.R. 1266. In that case a provision that only proof of 'actual' death would suffice was upheld."

In this connection see *New York Life Insurance Co. v. Chittenden & Eastman,* 134 Iowa 613, 112 N.W. 96, 98, 11 L.R.A., N.S., 233, wherein the following language is used:

"Had a judgment been secured in an action by the administrator with authority to represent the rights of all persons interested in the proceeds of the policies, such judgment would have been conclusive as to the death of Jarvis, and the company could not, after paying the amount of such judgment, have recovered back the money paid on discovering that the essential fact in issue in the case, to wit, the death of Jarvis, had been erroneously adjudicated. The judgment would have been conclusive as to that fact."

In this connection we refer to the case of *Steele v. Metropolitan Life Insurance Company,* 196 N.C. 408, 145 S.E. 787, 789, 61 A.L.R. 821, wherein it was held that the

beneficiary of a life insurance policy could not be required, as a condition of recovering judgment thereon, to give a bond for the protection and indemnity of the insurance company, in the event of the reappearance of the insured, who had been declared dead because of the seven-year presumption rule. The Court said:

"The presumption of death after seven years' absence of one who has disappeared and has not been heard from, after diligent search and inquiry, in reason and by authorities, applies to those who are insured. The presumption of seven years has long been the common law, which obtains in this jurisdiction. The contract of insurance is interpreted in reference to existing laws pertinent to the subject. The laws in force become a part of the contract as if they were expressly incorporated. The issue found by the jury is that the insured was dead at the date of the bringing of this action. By the verdict of the jury it was established that the insured is in fact dead so far as the rights of the parties are concerned. The court below had no power to impose on plaintiff the giving of bond, as set forth in the judgment."

The above statement is in line with the rule in this State and that is these laws were in force at the time of the writing of the contract of insurance, among them being the seven-year presumptive rule and became a part of the contract as if it were expressly incorporated into the policy.

As pointed out above if the company had so desired in the present cause it could have easily placed a provision in the policy in question requiring proof of actual death. The company can guard against such contingencies by such a provision in its policy.

The Insurance Company further contends that if the seven-year presumption had been the only thing in the case, nothing would have been paid because the policies lapsed on March 8, 1933. The company insists that because of fraud perpetrated by Buntin in disappearing and sending back documents to his grandfather and uncle, which amounted to suicide notes, the Court was misled into saying that the insured was dead, when, in fact, he was alive then and is alive now, and that the beneficiaries are chargeable with his fraud. The contention is not sound because no fiduciary relation existed between the Company and Buntin, and the Company was not deceived by his disappearance or any of his subsequent acts. Furthermore, even if Buntin's conduct was such that our Courts were misled by it, the very issue which we are concerned with now was presented at the former trial of the case, and has been rendered adversely to the Insurance Company and the plea of *res adjudicata* is good.

There is another reason why the bill in the present case cannot be maintained and that is the ten-year statute of limitation, which is contained in Section 8601 of the 1932 Code and is as follows:

"Ten years against guardians, executors, administrators, public officers, and on judgments.—Actions against guardians, executors, administrators, sheriffs, clerks, and other public officers on their bonds, actions on judgments and decrees of courts of record of this or any other state or government, and all other cases not expressly provided for, shall be commenced within ten years after the cause of action accrued."

The question is whether or not Buntin's acts are chargeable to the defendants so as to toll the running of

the statute of limitations. The defendants were not guilty of any fraud or collusion with the insured. They are not even fraudulent grantees of Buntin, and they obtained their benefits from the company by virtue of a judgment affirmed by this Court. In the proceeding herein the insured was not even a party. See *Boro v. Hidell,* 122 Tenn. 80, 99, 120 S.W. 961.

We are of the opinion, that in the absence of some fraudulent concealment on the part of the defendants, the complainant's cause of action, if any it had, has been barred by the ten-year statute of limitations.

Finally, complainant insists that regardless of anything else equity will not suffer a wrong without a remedy, and it insists that in equity, good conscience, honesty and decency, it is entitled to the money paid under the prior judgment.

Mr. Gibson in his Suits in Chancery Section 33, says that "equity will not suffer a wrong without a remedy," and that must be a civil injury to complainant's rights or interests, legal or equitable, before equity can apply the maxim.

There are many instances wherein Courts of Chancery are prevented by well-recognized legal principles from enforcing claims which in equity, good conscience and honesty should be enforced. For instance, an honest debt may be admittedly unpaid, but barred by the six-year statute of limitations. One may solemnly promise orally to pay the debt of another, but the statute of frauds may be successfully interposed in favor of the promisor, if such a promise is not reduced to writing.

If the courts of equity were not required to follow the law, there would be no stability in the administration of justice.

I am of the opinion therefore that the law in the case at bar was settled by this Court in the case of *Nashville Trust Company v. New York Life Insurance Company*, *supra,* and the judgment in said case is *res adjudicata* of the issues herein presented, and is binding upon us.

Furthermore, I am of the opinion that the suit of complainant is barred by the statute of limitations, and that the suit should be dismissed as was held by the Chancellor.

SWEPSTON, JUSTICE, concurs, except as to Statute of limitations.

### On Petition to Rehear

BURNETT, JUSTICE.

A petition to rehear has been filed herein raising four points, to wit: (1) a reargument is had on the main question presented originally that the fraud of the insured Buntin was intrinsic and not extrinsic; (2) that we erred in overruling the defense of the six and ten year statute of limitations; (3); that we inadvertently said that part of the relief sought was "newly discovered evidence" and (4) that we were wrong in saying that Buntin changed his beneficiary "shortly before he left."

We have very carefully read, and to the best of our ability analyzed, this 34-page petition to rehear as well as all authorities cited therein. To all intents and purposes, and so far as any particular question is raised herein, these questions were raised, briefed, and argued at length at the original hearing. Two questions raised are of no particular significance insofar as the decision is concerned.

The first question that is argued is a reargument of that so ably made originally on the question of whether

or not the evidence in this case was intrinsic or extrinsic. This is conceded on page 33 of the brief, but it is said that we "made a manifest mistake which rendered the decree of the Court manifestly erroneous (Gibson's Suits in Chancery, Sec. 1319)".

The main attack by this petition is on the Hazel-Atlas case. It is argued that in that case the fraud was practiced by the successful party and its attorney. In the instant case, Buntin, the insured, was the person or man who concocted the scheme and who was successful in it. Buntin reserved the right to change the beneficiary in his policy. When he did so the beneficiary has no interest but Buntin is the real party in interest. *Life Association v. Winn,* 96 Tenn. 224, 33 S.W. 1045. In that case this Court said:

"* * * the beneficiary acquires no vested interest until the death of the assured occurs. Until this event takes place, owing to the right of revocation which is by the condition reserved to the assured, the beneficiary has a mere expectancy, depending upon the will and act of the assured. * * * And this expectancy does not rise to the dignity of a property right. * * * The assured in such a policy (that is where the assured has the right to change the beneficiary) being the real party in interest, it follows that 'no harm can possibly result from giving full effect to his admissions' ".

Upon Shepardizing this case we find that it has been followed, down to date, in a number of opinions by this Court during the last 50 or 60 years. In one such case, *Merritt v. Scruggs,* 172 Tenn. 368, at page 374, 112 S.W. 2d 825, 827, this Court referring to the Winn case, among other things said:

"In such case, the death of the beneficiary before the death of the insured would authorize the company to recognize the insured as sole owner of the policy."

Every member of this Court has written an opinion in this case. It will not profit anything to reargue this question as we have argued it backward and forward time and time again and we of the majority are well satisfied that our feet are on firm ground and that we have reached the right conclusion. We must overrule the first point raised in the petition.

The next point raised by the petitioners is that the pleas of the statute of limitations should have been sustained. It seems to us that petitioners have misconceived the rule as it applies to our finding in this case. No attack is made on the finding of the majority that the Bank is holding the funds that it now possesses as a constructive trustee. It is the conception of petitioner that the statute started to run when the funds were received by the Bank. This argument overlooks two well-established facts, (a) that when the bank received this money the Insurance Company had no cause of action and could not come into court then because Buntin's fraud was not discovered until Buntin was himself located, and (b) that the whole basis of the present lawsuit is the discovery of Buntin alive and thus the uncovering of the fraud which he committed upon the Insurance Company and the Court, and it is for this fraud that wrongful retention of the money that the bank is held as a constructive trustee.

Our case of *Akers v. Gillentine,* 191 Tenn. 35, 231 S.W. 2d 369, 371, clearly and fully sets forth what the law is under such a situation.

"In most of the cases wherein the statute of limitations has been relied on as a defense the courts 'have

applied the statute from the date of actual or imputed knowledge by the *cestui* of the wrongful holding.' 4 *Bogert, supra,* Sec. 953, p. 213; *Haynie v. Hall's Ex'rs,* 25 Tenn. 290, 42 Am. Dec. 427; *Haynes v. Swann,* 53 Tenn. 560."

And then later on in that same opinion the distinction is again made, and this is particularly applicable in view of the apparent misconception of the matter by the petitioners here. This Court said:

"If we were dealing with creditors in the ordinary sense the date of the recordation of the deed would be applicable. Here though we have determined that *under the allegations* herein a constructive trust is made out. The very foundation of such trusts is an adverse inequitable holding wherein it necessarily follows that one is not bound until he learns of this wrongful holding or could have learned of it by reasonable diligence."

In 34 Am. Jur., Limitation of Actions, sec. 165, page 132, it is said:

"By the weight of judicial authority in this country, in actions at law as well as in suits in equity, to obtain relief against or damages for fraud of which the person injured remained ignorant for a time, either because of the concealment of the fraud or because it was of such character as to imply concealment, the bar of the applicable statute of limitations commences to run only from discovery or from when with reasonable diligence, there ought to have been a discovery of the facts constituting the fraud."

In this petition the petitioners cite the cases of *Boro v. Hidell,* 122 Tenn. 80, 120 S.W. 961; *Howell v. Thompson,*

95 Tenn. 396, 32 S.W. 309; *Barnes v. Barnes,* 157 Tenn. 332, 8 S.W.2d 481; and *Lee v. Harris,* 188 Tenn. 373, 219 S.W.2d 892, as authority for their position. All of these cases are good law and applicable to the facts there ruled on but the facts in none of these cases are in any way similar to or applicable to the facts in the instant case.

In the Boro case the court there found that through an agent the complainant had knowledge of the fraud for 18 years before the suit was brought. This is not a constructive trust case. In the Howell case the statute of limitations is involved but the facts in that case did not involve a constructive trustee and the rights of the *cestui* against such a trustee. In the Barnes case it is said that in the absence of fraudulent concealment an action to correct a mistake of a deed must be brought within 10 years after the accrual of a cause of action. That is not the case here. In the *Lee v. Harris* case nothing there involved is similar to that here. That case merely held that in the absence of fraudulent concealment that the 10-year statute applied.

Some intimation is made that we in the present case are attempting to graft on another interpretation of the limitation statute. This is far from true. As·is shown by the citation of authorities, as quoted in the *Akers v. Gillentine* case, that rule goes back as far as 24 Tenn., or more than 100 years. It is bound to be the right, sensible and equitable rule.

The petition here somewhat attempts to castigate this Court in holding one way in *Akers v. Gillentine, supra,* and in denying a petition for *certiorari* in the same case as is reported in 33 Tenn. App. 212, 231 S.W.2d 372. A close and careful analysis of those two cases, as reported, will clearly show the even casual reader that the Court

of Appeals expressly by clear language held that the case as reported in 191 Tenn. 35, 231 S.W.2d 369, was the law of the case insofar as the frame of the bill in that case was concerned wherein a constructive trust was alleged. In the Court of Appeals case after the allegations of a constructive trust had been alleged and the law applied as they were there alleged the case was remanded and on proof the Chancellor as well as the Court of Appeals found as a fact (1) that the complainants had failed to prove that the proceeds of the note were applied to the purchase of land involved, (2) that the note was not pledged to the bank as collateral security, and (3) there was no constructive trust involved. Thus after such a finding in the Court of Appeals case the Court very properly applied the seven-year statute, dealing with land and its possession, and held that such a statute started running more than a year before the bill was filed. This point must be overruled as we are absolutely confident that it was divided correctly in the original opinion.

 The next question sought to be raised is that we said in the outset of our original opinion that among other things that the case was based on was "on newly discovered evidence". Our recollection is that this question was argued at the bar. Whether it was contradicted or not a casual reading of our original opinion herein clearly shows that this had nothing to do with the opinion one way or the other. It was merely a preliminary statement of the drafts of the opinion. With this statement concerning the matter this point is likewise overruled.

The last point raised in the petition is that this Court in the majority opinion inadvertently said that Buntin had changed the beneficiary "shortly before he left". A

casual reading of the majority opinion will show that this fact had nothing in the world to do with the determination of the case. Time of course is a relative proposition. The changing of the beneficiary, which was done some two years prior to the time Buntin left, had no weight one way or the other as far as the determination of this present case was concerned. We did not intend that it have any effect one way or the other in the determination of this case. The only possible purpose that it could have and did have in the determination was to show that Buntin had the right under the terms of his policy to change the beneficiary whenever he saw fit and that exercising this right he did change the beneficiary. As to times and dates they were not mentioned and we did not consider them material and do not now insofar as this is concerned. For as said above in our reference to *Life Assurance Co. v. Winn, supra,* Buntin having this right to change his beneficiary he was the real party in interest.

We have read and re-read the petition herein and the authorities and carefully reconsidered the matter. As a whole it is nothing but a reargument of a portion of what was so well argued in the first instance. We are satisfied that we have reached the right conclusion. In view of this fact the petition to rehear must be overruled.