IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
July 19, 2011 Session

**SECURAMERICA BUSINESS CREDIT**
**v.**
**KARL SCHLEDWITZ and TERRY LYNCH**

**Direct Appeal from the Circuit Court for Shelby County**
**No. CT-001803-07     Donna M. Fields, Judge**

**No. W2009-02571-COA-R3-CV - Filed August 26, 2011**

This is a guaranty case.  Appellants personally guaranteed a line of credit for their trucking company.  Later, Appellants sold the trucking company to two employees, but were not released by the Appellee lender from their guaranties.  Under new ownership, the company falsified borrowing documents so that more money was extended on the line of credit than was collateralized per the loan agreement.  This was done with the complicity of the lender, but without the knowledge of the guarantors.  The debtor trucking company defaulted, and the lender sought repayment of the loan from the guarantors.  Following a bench trial, the trial court found Appellants liable for their personal guaranties, but denied prejudgment interest and punitive damages due to what the court characterized as the fraudulent actions of Appellee.  In an apparent clerical mistake, on the same date that the trial court entered its final judgment, it also entered an order voluntarily dismissing all claims against Appellants.  More than a year later, the trial court entered an order clarifying its prior order of dismissal.  After a thorough review of the record, we conclude that: (1) the trial court properly afforded Appellee relief under Tenn. R. Civ. P. 60.01 to clarify its prior order of dismissal; and (2) the trial court made incomplete and contradictory findings of fact and conclusions of law, such that further appellate review is precluded.  Consequently, we vacate and remand for additional findings.

**Tenn. R. App. P. 3. Appeal as of Right; Judgment of the Chancery Court Vacated and Remanded**

J. STEVEN STAFFORD, J., delivered the opinion of the Court, in which ALAN E. HIGHERS, P.J., W.S., and DAVID R. FARMER, J., joined.

David J. Cocke, Memphis, Tennessee, for the appellants, Karl Schledwitz and Terry Lynch.

W.O. Luckett, Jr., Clarksdale, MS, and Lorrie K. Ridder, Memphis, Tennessee, for the appellee, SecurAmerica Business Credit.

Webb A. Brewer and Steven E. Barlow, Memphis, TN, for the Amicus Curiae, Tennessee Citizen Action Alliance, Inc.

Frank S. Cantrell, Bruce C. Harris, and Craig P. Barnes, Memphis, TN, for the Amicus Curiae, Memphis Area Legal Services, Inc.

## OPINION

### I.  Background Facts[1]

Appellee SecurAmerica Business Credit ("SecurAmerica") brought this action on March 27, 2001, against Southland Transportation Co., LLC ("Southland Transportation"), Southland Capital Co. ("Southland Capital"), and Appellants Karl Schledwitz and Terry Lynch.  SecurAmerica's claims arose from an alleged default on the September 16, 1999 Secured Revolving Credit Agreement ("Credit Agreement"), which was entered by and between SecurAmerica and Southland Transportation.  This Credit Agreement was personally guaranteed by Appellants, who were the co-equal owners of Southland Transportation at that time.

When it entered the Credit Agreement, SecurAmerica was a lender licensed by the State of Tennessee under the Tennessee BIDCO[2] Act, *see* Tenn. Code Ann. § 45-8-201 *et seq.*, which gave it the authority to make loans to businesses that would not otherwise qualify for traditional financing.  SecurAmerica's typical client was a small-to medium-sized business that was highly leveraged and presented a higher level of lending risk.  Southland Transportation, a trucking company, was such a business.

The Credit Agreement between SecurAmerica and Southland Transportation was structured as a revolving line of credit and was intended to provide working capital for the trucking company based on the value of certain current assets.  To secure the line of credit, SecurAmerica took a security interest in several of the assets of Southland Transportation.

---

[1]We cull these facts from the trial court's findings, the briefs, and the appellate record.  Given our decision herein that the trial court's findings were incomplete, we present these facts for narrative purposes only.

[2]BIDCO is an acronym for a "business and industrial development corporation."  Tenn. Code Ann. § 45-8-203(4).

The primary assets with value, and the intended sources of repayment, however, were Southland Transportation's working assets, specifically, its accounts receivable.

Per the terms of the Credit Agreement, SecurAmerica lent Southland Transportation money on a revolving basis based on the value of certain current assets (i.e., the "borrowing base"). Consequently, the assets that made up the borrowing base were to be reported, monitored, and evaluated on a daily basis. In order to obtain funds, Southland Transportation submitted daily borrowing base certificates to SecurAmerica. These borrowing base certificates identified the amount of eligible accounts receivable that Southland Transportation maintained on its books.[3] Based upon the amount listed on the borrowing base certificates, SecurAmerica would advance monies to Southland Transportation to fund its daily operations. To pay down the loan balance, Southland Transportation maintained a bank account called a "blocked account," into which it directed its customers to send their invoice payments. As these payments accrued in the blocked account, monies would be wired directly to SecurAmerica to be applied to the balance of the line of credit. This was the basic procedure for lending and repaying monies as outlined in the Credit Agreement.

As a condition to lending money to Southland Transportation, SecurAmerica required the interested parties to take additional actions. First, Mr. Schledwitz agreed to sign a Guaranty of Validity of Collateral in favor of SecurAmerica, whereby he guaranteed that the collateral securing the Credit Agreement, specifically the accounts receivable, were bona fide, existing accounts in accordance with the terms of the Credit Agreement. Mr. Schledwitz's Guaranty of Validity of Collateral stated that it was a continuing agreement that remained in effect until any liabilities incurred under the Credit Agreement had been paid in full. Second, Southland Capital, a separate company owned and operated by Appellants, signed a Subordination Agreement in favor of SecurAmerica. Southland Capital regularly lent money and infused capital into Southland Transportation as a means of supporting the struggling trucking company. By this Subordination Agreement, Southland Capital agreed to subordinate its rights to repayment by Southland Transportation to the rights of SecurAmerica. Thus, as between SecurAmerica and Southland Capital, the former was to be the senior creditor to Southland Transportation. Third, SecurAmerica required Messrs. Schledwitz and Lynch to sign a personal guaranty in the amount of $500,000 each. The personal guaranties were identical in substance, and provided, in relevant part, as follows:

> The Guarantor hereby (a) unconditionally and irrevocably
> guarantees the punctual payment and performance when due
> (whether at stated maturity, by acceleration or otherwise) of all

---

[3]Eligible accounts were generally defined by the Credit Agreement to be accounts arising out of sales in the ordinary course of business that were not more than ninety days old.

of the Liabilities up to Five Hundred Thousand Dollars ($500,000) and (b) agrees to pay any and all costs and expenses (including attorney's fees and related expenses) incurred by the Lender in enforcing any rights under this Guaranty.

The Credit Agreement provided that advances were not to exceed the lesser of (1) $1.5 million; or (2) 85% of eligible accounts receivable. Two months after its inception, in November 1999, the loan was fully funded (i.e., at its maximum loan balance of $1.5 million), and more or less remained that way while Southland Transportation was in existence. A field examination performed by SecurAmerica in June 2000 revealed that the eligible accounts receivable were sufficient to cover the advances and to protect SecurAmerica in the event of default.[4]

However, this is not to say that Southland Transportation was a profitable business. The company faced significant cash flow problems, and Southland Capital repeatedly infused money into the business. With a struggling business on their hands, Appellants explored opportunities to sell the trucking operation. In August 2000, Appellants sold Southland Transportation to two of its employees – Michael Harrell and Michael Lucchesi.[5] Messrs. Harrell and Lucchesi did not pay a cash purchase price for their respective interests. Rather, the transaction was structured so that Appellants retained certain debts of Southland Transportation, and Messrs. Harrell and Lucchesi obligated themselves on a promissory note payable to Appellants.[6] Messrs. Harrell and Lucchesi envisioned a leaner operation with less debt, and all four gentlemen apparently believed that the trucking company could be a viable business going forward.

This change in ownership constituted an event of default under the Credit Agreement. However, SecurAmerica did not accelerate the loan, nor did it release Appellants from their personal guaranties. Rather, after the sale, SecurAmerica continued to lend money to Southland Transportation under the Credit Agreement, and Appellants remained as guarantors. Notwithstanding the restructuring, or perhaps because of it, Southland Transportation continued its descent into unprofitability. Soon after the sale, thirty to forty truck drivers left, striking a blow to the company's revenue stream. Messrs. Harrell and

_____

[4]SecurAmerica generally conducted field examinations of Southland Transportation on a quarterly basis. It did not perform a field examination in September or December 2000.

[5]The sale was effective August 1, 2000; however, some of the closing documents were not signed until September 2000.

[6]SecurAmerica contended at trial that this purported sale was, in fact, a "gift" of a failing business in order for Appellants to avoid liability on their guaranties. The trial court determined that it was a sale.

-4-

Lucchesi were likewise unsuccessful in their efforts to bring other investors on board.

Sometime between August 2000 and February 2001, Southland Transportation began falsifying the borrowing base certificates that it submitted on a daily basis in order to acquire additional funds from SecurAmerica. These borrowing base certificates were falsely inflated to make it appear that Southland Transportation had a higher eligible accounts receivable balance than it actually did, which consequently allowed it to obtain advances from SecurAmerica in excess of that provided by the Credit Agreement. Essentially, this created an out of balance debt-to-collateral ratio because monies were advanced on the basis of accounts receivable that did not exist. For example, in August 2000, $815,000 was collected from accounts receivable and put in the blocked account to pay down the loan. That amount fell to $604,000 in September; $414,000 in October; $187,000 in November; and $24,000 in December. Thus, Southland Transportation's actual accounts receivable balance was dropping precipitously; however, all the while, the line of credit remained at its maximum balance of approximately $1.5 million.[7]

The genesis of the false borrowing base certificates is sharply contested. Mr. Harrell testified that the falsifying began in August 2000 at the suggestion of SecurAmerica's President, Mr. Randall Reagan. Mr. Reagan testified that he was unaware of this practice until December 2000, and that he virtually ceased lending to Southland Transportation after he discovered that Mr. Harrell was falsifying the certificates. However, it is uncontroverted that, for some period of time, both Mr. Harrell and Mr. Reagan were aware that the borrowing base certificates had been falsified; nevertheless, SecurAmerica continued to make advances. In addition to the falsified borrowing base certificates, Mr. Harrell, with the knowledge and complicity of Mr. Reagan, began diverting accounts receivable remittances around the blocked account. Now, instead of being used to pay down the line of credit, as required by the terms of the Credit Agreement, this money was diverted to fund the day-to-day operations of Southland Transportation.

Mr. Reagan's complicity in the falsified borrowing base certificates apparently stemmed from his belief that continuing to lend operating capital to Southland Transportation was the best option to prevent the company from failing and defaulting on its loan. At the same time that the Southland Transportation loan was failing, SecurAmerica had several other "problem" loans in its portfolio. In fact, SecurAmerica had been placed in default by its own lender, TransAmerica. Consequently, Southland Transportation's eventual ability to pay off its debts was pivotal to SecurAmerica's ability to pay off its own debts.

---

[7]The collections in January and February 2001 were approximately $69,000 and $50,000, respectively. The loan balance more or less remained at its maximum during these months as well.

Despite his knowledge that the Southland Transportation loan was failing and was now based on falsified documentation, Mr. Reagan did not inform anyone, particularly the Appellants or SecurAmerica's board of directors, of the dire situation. After selling Southland Transportation in August 2000, Appellants were unaware that money was being loaned based on false borrowing base certificates or that money was being diverted around the blocked account. Appellants had retained the right to inspect the books and records of Southland Transportation when they sold the business to Messrs. Harrell and Lucchesi. However, Appellants had not exercised this right and so remained uninformed as to the plight of the trucking company. Meanwhile, Southland Transportation continued to struggle. After losing its biggest customer in February 2001, Southland Transportation ceased doing business, thereby defaulting on the Credit Agreement.

In March 2001, Mr. Reagan revealed the fate of Southland Transportation to SecurAmerica's board of directors. After the board of directors learned of his actions, he was promptly fired.[8] SecurAmerica accelerated the debt ($1,485,564.45 plus accrued interest according to SecurAmerica's records). Because Southland Transportation had insufficient assets to satisfy the loan balance, SecurAmerica sought repayment from Appellants under their personal guaranties. After learning of the actions of Mr. Harrell and Mr. Reagan, Appellants declined to honor their guaranties.

## 2. Procedural History

On March 27, 2001, SecurAmerica filed its complaint in the Shelby County Chancery Court against Southland Transportation, Mr. Schledwitz, Mr. Lynch, Mr. Lucchesi, and Mr. Harrell. Essentially, the complaint sought a judgment against Southland Transportation on the promissory note, against all of the defendants for fraud in connection with the falsified borrowing base certificates, against Mr. Schledwitz individually on the Guarantee of Validity of Collateral, and against Mr. Schledwitz and Mr. Lynch on their personal guaranties.

On May 17, 2001, Appellants Schledwitz and Lynch filed their answer and asserted the affirmative defense of fraud by SecurAmerica. *See* Tenn. R. Civ. P. 8.03. Appellants also asserted, *inter alia*, that SecurAmerica had: (1) breached the implied covenant of good faith and fair dealing; (2) failed to preserve its collateral; and (3) significantly increased the risk of nonpayment by Southland Transportation. Appellants also filed a cross-claim alleging conspiracy and fraud against Southland Transportation and Mr. Reagan, in both his individual and corporate capacities.

---

[8]Mr. Reagan later entered into a settlement agreement with SecurAmerica in which he forfeited his retirement account, worth approximately $540,000, in exchange for SecurAmerica's covenant not to sue.

On January 21, 2004, SecurAmerica amended its complaint to allege new claims against Southland Transportation for breach of contract, and against Southland Capital for tortious interference with contract. SecurAmerica sought a constructive trust for the alleged breach of the Subordination Agreement. SecurAmerica also added claims against Appellants and their wives, Gail Schledwitz and Robyn Lynch, for fraudulent conveyance.[9] On April 12, 2004, Appellants filed their second amended answer to raise additional affirmative defenses and to amend their counterclaim against SecurAmerica and their cross-claim against Mr. Reagan and Southland Transportation to allege violations of the Tennessee Consumer Protection Act. Myriad amended pleadings, motions, and responses followed.

All claims by all the parties against defendants Harrell, Lucchesi, and Reagan were eventually voluntarily dismissed. The trial court bifurcated the fraudulent conveyance claims against Appellants and their wives, and proceeded to try all other claims at a bench trial held January 7 – 15, 2008.

More than a year later, on January 30, 2009, the trial court entered its findings of fact and conclusions of law. Therein, judgment was rendered in favor of SecurAmerica against Appellants on their personal guaranties for $500,000 each. The trial court declined to award pre-judgment interest due to its finding that Mr. Reagan and SecurAmerica had committed fraud. The trial court dismissed SecurAmerica's claims on the Guaranty of Validity of Collateral signed by Mr. Schledwitz, and on the Subordination Agreement against Southland Capital, and declined to award SecurAmerica punitive damages. The court also dismissed Appellants' claims under the Tennessee Consumer Protection Act.

On March 2, 2009, Appellants filed a motion to alter or amend the judgment. On July 17, 2009, Defendants Gail Schledwitz and Robin Lynch moved for summary judgment on SecurAmerica's fraudulent conveyance claims against them, which had previously been bifurcated and were not yet resolved. On November 20, 2009, the trial court denied Appellants' motion to alter or amend, awarded SecurAmerica $125,000 in attorney's fees against each Appellant, and entered its final amended judgment, which specifically incorporated its earlier findings of fact and conclusions of law from January 30, 2009.

On the same day that the trial court entered its final amended judgment, November 20, 2009, it also entered an order granting SecurAmerica a voluntary nonsuit "as to Defendants Karl Schledwitz, Gail Schledwitz, Terry Lynch, and Robin Lynch."

Appellants timely filed their notice of appeal on December 4, 2009. Upon reviewing

---

[9]SecurAmerica asserted that Appellants had fraudulently transferred certain assets to their wives in an attempt to shelter those assets from judgment.

-7-

the appellate record, this Court ascertained that the trial court's orders of November 20, 2009, appeared contradictory. Specifically, it appeared that SecurAmerica had voluntarily nonsuited all of its claims against Appellants on the same day that a final judgment was entered granting relief on certain of those same claims. On January 5, 2011, we entered an order directing the parties to clarify these seemingly incompatible rulings. Oral argument was held on January 25, 2009, and the matter was argued by counsel. Thereafter, on January 28, 2009, SecurAmerica filed a motion styled "Appellee SecurAmerica's Motion Pursuant to Rule 60.01 for Leave to Seek Correction of November 20, 2009 Orders by Trial Court." By order of February 15, 2011, we remanded the matter to the trial court "for the limited purpose of permitting Appellee relief regarding the 'Order Granting Voluntary Nonsuit.'" Following remand, SecurAmerica filed a motion in the trial court seeking correction of the "Order Granting Voluntary Nonsuit." The trial court then entered an order pursuant to Tenn. R. Civ. P. 60.01 styled, "Order Clarifying and Correcting November 20, 2009 Order of Voluntary Nonsuit *as to the Fraudulent Conveyance Claims Only*." (Emphasis added). Therein, the trial court stated that:

> The Court hereby clarifies the November 20, 2009 Order of Voluntary Nonsuit by stating that said Order dismissed only the fraudulent conveyance claims, as those were the only claims then pending before the Court. Neither the Plaintiff, SecurAmerica, nor this Court intended to dismiss the entire case by entering the Order of Voluntary Nonsuit.

On March 16, 2011, Appellants filed a second notice of appeal. By order of April 7, 2011, we consolidated Appellants' appeals and directed the parties to file a supplemental brief regarding the trial court's clarifying order. The issue having been briefed, this case is now properly before this Court.

### 3.  Issues Presented

Appellants request that we review the following issues, as restated from their brief:

(1) Whether SecurAmerica's fraudulent conduct abrogates Appellants' guaranties?

(2) Whether Appellants' satisfied their burden of proof for damages they incurred as a result of SecurAmerica's fraud?

(3) Whether Appellants had a duty to monitor the subject loan and, if so, what was the extent of that duty?

(4) Whether SecurAmerica's fraudulent conduct constituted a violation of the Tennessee Consumer Protection Act?

Additionally, Appellee raises the following issues, as restated from its brief[10]:

(5) Whether the trial court erred in finding for SecurAmerica on Appellants' personal guaranties and not on Mr. Schledwitz's Guaranty of Validity of Collateral?

(6) Whether the trial court erred in declining to award prejudgment interest?

(7) Whether the trial court erred in finding that SecurAmerica ratified the actions of Mr. Reagan?

(8) Whether the trial court erred in finding that the actions of SecurAmerica, through Mr. Reagan, constituted fraud?

We note that the *amicus* briefs raise several issues related to the trial court's denial of Appellants' claims under the Tennessee Consumer Protection Act. However, for the reasons stated fully below, we are unable to conduct judicial review on the record presented to us. Consequently, we do not reach the issues raised by either the parties or the *amici curiae.*

## 4. Analysis

## A. <u>Standard of Review</u>

This matter was tried without a jury. Consequently, we review the trial court's findings of fact *de novo* with a presumption of correctness, unless the evidence preponderates otherwise. Tenn. R. App. P. 13(d). No presumption of correctness, however, attaches to the trial court's conclusions of law and our review is *de novo*. ***Bowden v. Ward***, 27 S.W.3d 913, 916 (Tenn. 2000). For the evidence to preponderate against a trial court's finding of fact, it must support another finding of fact with greater convincing effect. ***Walker v. Sidney Gilreath & Assocs.***, 40 S.W.3d 66, 71 (Tenn. Ct. App. 2000); ***The Realty Shop, Inc. v. R.R. Westminster Holding, Inc.***, 7 S.W.3d 581, 596 (Tenn. Ct. App. 1999). When the resolution of the issues in a case depends upon the truthfulness of witnesses, the trial judge who has the opportunity to observe the manner and demeanor of the witnesses while testifying is in a far

---

[10]We have intentionally omitted certain issues presented by Appellee that we find duplicative.

better position than this Court to decide those issues. *See **McCaleb v. Saturn Corp**.*, 910 S.W.2d 412, 415 (Tenn. 1995); ***Whitaker v. Whitaker***, 957 S.W.2d 834, 837 (Tenn. Ct. App. 1997). "If the trial court's factual determinations are based on its assessment of witness credibility, this Court will not reevaluate that assessment absent clear and convincing evidence to the contrary." ***Heffington v. Heffington,*** No. M2009-00434-COA-R3-CV, 2010 WL 623629, at *2 (Tenn. Ct. App. Feb. 19, 2010) (citing ***Jones v. Garrett***, 92 S.W.3d, 835, 838 (Tenn. 2002)).

## B. **Order of Nonsuit and Clarifying Order**

We are first compelled to discuss the trial court's orders of November 20, 2009, in which it simultaneously rendered final judgment in favor of SecurAmerica on Appellants' personal guaranties and granted a voluntary nonsuit of all claims against Appellants. As noted above, on remand, the trial court entered a clarifying order correcting its order of nonsuit pursuant to Tenn. R. Civ. P. 60.01.[11] Therein, the trial court indicated that its intent was to grant a nonsuit as to the pending fraudulent conveyance claims only and not as to all claims against Appellants.

Appellants contend that SecurAmerica was not entitled to relief under Rule 60.01 because that rule addresses itself to clerical errors of the court and not to mistakes of counsel. According to Appellants, the filing of a voluntary "nonsuit is in the hands of the plaintiff, and the judge has no discretion with regard to the form of the order." Appellants urge that SecurAmerica's relief should have been sought under Tenn. R. Civ. P. 60.02 because the order of nonsuit reflected a drafting error by SecurAmerica's counsel.[12] Rule 60.02 contains a one-year time period for correcting such mistakes; consequently, Appellants urge that

---

[11]Tenn. R. Civ. P. 60.01 provides, as follows:

Clerical mistakes in judgments, orders or other parts of the record, and errors therein arising from oversight or omissions, may be corrected by the court at any time on its own initiative or on motion of any party and after such notice, if any, as the court orders. During the pendency of an appeal, such mistakes may be so corrected before the appeal is docketed in the appellate court, and thereafter while the appeal is pending may be so corrected with leave of the appellate court.

[12]Tenn. R. Civ. P. 60.02 provides, in relevant part, as follows:

On motion and upon such terms as are just, the court may relieve a party or the party's legal representative from a final judgment, order or proceeding for the following reasons: (1) mistake, inadvertence, surprise or excusable neglect . . . . The motion shall be made within a reasonable time, and . . . . not more than one year after the judgment, order or proceeding was entered or taken.

-10-

SecurAmerica irretrievably nonsuited all of its claims because more than a year had passed since the order of nonsuit was entered. We disagree.

Voluntary dismissal of a cause of action is governed by Tenn. R. Civ. P. 41.01.[13] In interpreting Rule 41.01, our Supreme Court has held that, in non-jury cases, the plaintiff has the right to take a voluntary dismissal "until the matter has been finally submitted to the trial judge for decision." *Weedman v. Searcy*, 781 S.W.2d 855, 857 (Tenn. 1989). However, after the matter has been finally submitted to the trial court for a determination on the merits, the plaintiff can no longer take a voluntary dismissal as a matter of right. *Id.*; *see also Hamilton v. Cook*, No. 02A01-9712-CV-00324, 1998 WL 704528, at *4 (Tenn. Ct. App. Oct. 12, 1998). Once the right to a voluntary nonsuit has been lost, however, the trial court may still grant a dismissal upon the exercise of its sound discretion. *See McCann Steel Co. v. Carney*, 237 S.W.2d 942, 944 (Tenn. 1951); *Hamilton*, 1998 WL 704528, at *5.

In the instant case, we note that a bench trial was held in January 2008, and the trial court submitted its findings of fact and conclusions of law on January 30, 2009. While not styled as a "judgment," this order substantively decided the issues between the parties. In response, Appellants filed a "Motion to Alter or Amend Judgment" on March 3, 2009. When the trial court entered its "Final Amended Judgment," on November 20, 2009, it specifically referred to its earlier findings of fact and conclusions of law as having had the effect of a judgment and incorporated its findings therein.

In short, at the time SecurAmerica was purported to have taken a voluntary nonsuit, the matter had been finally submitted to the trial court, and, in fact, had already been decided. The trial court had rendered its decision on the parties' substantive claims in its findings of fact and conclusions of law, and the decision could only be altered upon the discretion of the trial court. Thus, SecurAmerica could not have taken a nonsuit without the trial court invoking its discretion to permit such a nonsuit. Appellants argue that the trial court played

---

[13]Tenn. R. Civ. P. 41.01 provides, in relevant part, as follows:

(1) Subject to the provisions of Rule 23.05, Rule 23.06, or Rule 66 or of any statute, and except when a motion for summary judgment made by an adverse party is pending, the plaintiff shall have the right to take a voluntary nonsuit to dismiss an action without prejudice by filing a written notice of dismissal at any time before the trial of a cause and serving a copy of the notice upon all parties, and if a party has not already been served with a summons and complaint, the plaintiff shall also serve a copy of the complaint on that party; or by an oral notice of dismissal made in open court during the trial of a cause; or in jury trials at any time before the jury retires to consider its verdict and prior to the ruling of the court sustaining a motion for a directed verdict. If a counterclaim has been pleaded by a defendant prior to the service upon the defendant of plaintiff's motion to dismiss, the defendant may elect to proceed on such counterclaim in the capacity of a plaintiff.

no role in the order of nonsuit and that the mistake was attributable to the inadvertence of SecurAmerica's counsel. However, such an argument overlooks the fact that SecurAmerica did not have an unfettered right to take a nonsuit at that time. Rather, it could do so only with the trial court's permission. For this reason, Tenn. R. Civ. P. 60.01 was the appropriate rule for the trial court to use in order to clarify its intent as to its nonsuit order of November 20, 2009.

Tenn. R. Civ. P. 60.01 "empowers trial courts . . . to correct 'errors [in judgments] . . . arising from oversight or omissions . . . .'" *Spann v. Abraham*, 36 S.W.3d 452, 461-62 (Tenn. Ct. App. 1999) (quoting Tenn. R. Civ. P. 60.01). We review a trial court's decision whether to grant a Rule 60.01 motion under an abuse of discretion standard. *Anderson v. Anderson*, No. M2004-01570-COA-R3-CV, 2006 WL 1627181, at *6 (Tenn. Ct. App. June 9, 2006). Our Supreme Court has stated that "[u]nder the abuse of discretion standard, a trial court's ruling 'will be upheld so long as reasonable minds can disagree as to propriety of the decision made.'" *Eldridge v. Eldridge*, 42 S.W.3d 82, 85 (Tenn. 2001) (quoting *State v. Scott*, 33 S.W.3d 746, 752 (Tenn. 2000); *State v. Gilliland*, 22 S.W.3d 266, 273 (Tenn. 2000)). This standard does not permit the appellate court to substitute its judgment for that of the trial court. *Myint v. Allstate Ins. Co.*, 970 S.W.2d 920, 927 (Tenn. 1998). Rather, an abuse of discretion occurs only when the trial court "'applies an incorrect legal standard, or reaches a decision which is against logic or reasoning that causes an injustice to the party complaining.'" *Eldridge*, 42 S.W.3d at 85 (quoting *State v. Shirley*, 6 S.W.3d 243, 247 (Tenn.1999)).

Upon review, we conclude that the trial court did not abuse its discretion in providing SecurAmerica Rule 60.01 relief for the following reasons. First, under the circumstances, it is nonsensical that SecurAmerica would nonsuit a million-dollar judgment on the same day the judgment was rendered. Second, the fraudulent conveyance claims, which had been previously bifurcated, were the only claims still pending, so they were logically the only claims that could be voluntarily dismissed. Third, there was a pending summary judgment motion on the fraudulent conveyance claims, filed by Defendants Gail Schledwitz and Robyn Lynch, that was set to be heard on November 20, 2009 (which explains why the claims would be dismissed on that particular day). Fourth, Appellants appealed to this Court from the final judgment of the trial court. If Appellants understood the order of nonsuit as dismissing all claims against them, there would be nothing left for them to appeal. It appears that all involved, including the trial court, understood that the order of nonsuit applied only to the fraudulent conveyance claims. Under these admittedly bizarre facts, we conclude that the trial court did not err in granting SecurAmerica relief pursuant to Rule 60.01 to clarify its earlier order of nonsuit.

### C. **Fraud, Good Faith, and the Trial Court's Findings**

-12-

A guaranty is a contract and is to be construed according to the ordinary meaning of the language used and with the view to carry out the intent of the parties. *First Nat'l Bank v. Foster*, 451 S.W.2d 434, 436 (Tenn. Ct. App. 1969). Guaranties are considered special contracts under Tennessee law. *SunTrust Bank v. Dorrough*, 59 S.W.3d 153, 156 (Tenn. Ct. App. 2001). Guarantors are disfavored in Tennessee, and we will construe a guaranty against the guarantor as strongly as the language will permit. *Id.* (citing *Squibb v. Smith*, 948 S.W.2d 752, 755 (Tenn. Ct. App. 1997); *Farmers–Peoples Bank v. Clemmer*, 519 S.W.2d 801, 805 (Tenn. 1975)).

Appellants do not raise any issue concerning either the origination or execution of the personal guaranties in question. We believe it is a fair summary of Appellants' varied arguments to say that, but for the alleged concerted actions of the debtor and the lender in the performance of the underlying Credit Agreement, Appellants concede their liability under the guaranties. Rather, Appellants contend that SecurAmerica, through the actions of its President Mr. Reagan, *inter alia*, committed conspiracy and fraud, violated the implied covenant of good faith and fair dealing, impaired the collateral securing the debt, and dissipated assets; and that these actions relieve Appellants of liability on their guaranties. SecurAmerica, on the other hand, essentially argues that the language of the guaranties governs all dealings between the parties, that the actions of Mr. Reagan were authorized by the Credit Agreement or were instances of poor business judgment, and that any fraud which Mr. Reagan may have committed cannot be imputed to SecurAmerica.

After a bench trial spanning two weeks, the trial court issued its thirty-three page findings of fact and conclusions of law. Therein, the trial court repeatedly characterized the actions of Southland Transportation (through Mr. Harrell) and SecurAmerica (through Mr. Reagan) as being fraudulent. The trial court reasoned that it would be inequitable to "avoid the original guarant[ies]," which Appellants "entered into fully aware and accepting of the requirements," but that it would be likewise inequitable "to hold the Guarantors to an alteration of the contract based upon the fraudulent actions of the Lender." After applying equitable principles, the trial court held Appellants liable for the full amount of their personal guaranties, $500,000 each, but denied prejudgment interest "because of the fraud on the part of Randall Reagan and SecurAmerica," and further denied punitive damages or any judgment over the amount of the guaranties.

We have conducted a painstaking review of the record, and of the trial court's judgment, and conclude that judicial review is precluded by incomplete and contradictory findings by the trial court. Specifically, the trial court made incomplete and contradictory findings on the issue of fraud by SecurAmerica. The trial court also neglected to address Appellants' defense that SecurAmerica violated the implied covenant of good faith and fair

-13-

dealing. As discussed below, these findings are foundational to appellate review of this case, and without them we cannot adjudicate these issues.

### i. Fraud

It is well settled in Tennessee that the courts of our State will not be used to enforce a contract which is the product of fraud; indeed, fraud vitiates all that it touches. **Shelby Elec. Co. v. Forbes**, 205 S.W.3d 448, 455 (Tenn. Ct. App. 2005); *see also* **New York Life Ins. Co. v. Nashville Trust Co.**, 200 Tenn. 513, 292 S.W.2d 749, 754 (1956). Fraud arranged between a creditor and a debtor can thus affect a guarantor's obligation. In **Transouth Mortgage Corp. v. Keith**, 1985 WL 4677 (Tenn. Ct. App. Dec. 24. 1985), this Court reviewed a judgment based upon a guaranty. The defendant in **Transouth** executed a personal guaranty in favor of the plaintiff bank guaranteeing an auto dealer's debt. **Id.** at *1. The auto dealer defaulted, and the bank sued the guarantor. **Id.** The guarantor counterclaimed fraudulent concealment, alleging that the bank had a duty to inform the guarantor of the debtor's financial difficulties prior to the guaranty and "to notify the defendant when the plaintiff knew or should have known that [the debtor] was floor planning the same vehicle more than once, had sold some vehicles out of trust, and had written checks that bounced." **Id.** at *3. We stated:

> *[A]bsent a conspiracy which is not alleged*, we hold that unless the guaranty agreement provides otherwise, there is no duty on the party to whom the guaranty is directed to notify the guarantor of the business practices or financial difficulties of the party whose performance is being guaranteed, whether such practices occurred prior to the execution or during the term of the guaranty and whether such activities were known or should have been known by the party guaranteed. To hold otherwise would make one party the *de facto* guardian of the other. Certainly in business practices one is required to act fairly and in good faith. *See* T.C.A. § 47-1-203.[14] However, "fairly" does not mean hold the other's hand, and guide and properly advise him through the transaction. This is especially so when such tender care is not requested and the pleadings do not reveal such request. *Absent a trust relationship or fraud*, contracting parties are charged with the duty of looking out for themselves.

---

[14]Former section 47-1-203 was renumbered to section 47-1-304 by 2008 Pub. Acts, c. 930, § 1, effective July 1, 2008.

***Transsouth***, 1985 WL 4677, at *3 (emphases added); *see also **Walker v. First State Bank***, 849 S.W.2d 337, 342 (Tenn. Ct. App. 1992) (noting, in a case with similar facts and result, that the guarantor had not plead that a conspiracy existed between the creditor and the debtor).

From these cases, it is apparent that, where a conspiracy or fraud between the debtor and the creditor is alleged, as is the case here, such fraudulent behavior may affect the liability of the guarantor. The ultimate effect, however, is dependent upon a finding of fraud or conspiracy in the first place. Here, while the trial court found that SecurAmerica and Southland Transportation acted fraudulently, it did not make the specific and consistent findings of fact necessary for this Court to review its determination.[15]

First, the trial court determined that SecurAmerica was responsible for the actions of its President, Mr. Reagan, because it ratified his actions. However, the court did not make the necessary findings to explain its decision. We note that this issue did not appear to be litigated at trial before the trial court decided the issue in its findings of fact and conclusions of law.[16] However, in doing so, the court did not make specific findings to support its conclusion, and the supporting statements it did make were contradictory. For example, the trial court states that, "SecurAmerica adopted and ratified the actions of Randall Reagan and could not have given Schledwitz and Lynch notice because Randall Reagan was acting alone, without input from the Board of Directors or any other officer in SecurAmerica." Later, the court states that SecurAmerica "has ratified the fraudulent acts" of Mr. Reagan because it "adopt[ed] and advance[d]" his actions. The first statement appears contradictory, and the second, vague and conclusory. Neither explanation provides a reviewing court with a rationale for the trial court's decision.

Next, no finding was made regarding when SecurAmerica's fraudulent activity began. In its findings of fact and conclusions of law, the trial court notes that Mr. Harrell testified that the false borrowing base certificates were first submitted at the suggestion of Mr. Reagan sometime in the Fall of 2000, perhaps as early as August 2000. On the other hand, the trial

---

[15]Appellants also asserted a claim for conspiracy against Mr. Reagan in his corporate capacity as President of SecurAmerica. The trial court apparently did not rule on this claim.

[16]SecurAmerica argued at trial that Mr. Reagan's actions were within the scope of the powers granted to him by the Credit Agreement. After the trial court's finding that SecurAmerica ratified the actions of Mr. Reagan, SecurAmerica now argues on appeal that Mr. Reagan was acting outside of the scope of his agency. A party is not generally permitted to take one position at trial and a different position on appeal. *See **State v. Harris***, 839 S.W.2d 54, 65-66 (Tenn. 1992). However, given that we cannot discern the basis for the trial court's decision, we find it necessary to remand for further findings notwithstanding SecurAmerica's inconsistent positions.

-15-

court notes that Mr. Reagan testified that he did not know about the false certificates until December 2000 or January 2001. At one point, the trial court indicates that the failure of SecurAmerica to perform a regular quarterly field examination in September or December 2000, as well as the fact that Mr. Reagan no longer insisted on daily reports from Southland Transportation, "lends credence to the testimony of Michael Harrell that the false reporting began in August 2000." However, the trial court never makes a specific finding of fact as to when the fraudulent actions of SecurAmerica began. Without a finding as to when the fraudulent activity began, we cannot begin to review the effect such fraudulent activity may have had on the underlying debt, and, eventually, the guaranties. The findings of the trial court indicate that, at the time of the sale of Southland Transportation, in August 2000, the loan was fully collateralized with $1.7 million accounts receivable securing a loan balance of approximately $1.5 million. At the time of default, the loan was still approximately at its maximum balance; however, the accounts receivable had eroded significantly. The trial court found that neither party had proven the amount of liquidated accounts receivable, but primarily attributed the erosion of collateral to the failure of the business. However, without a finding of fact as to when the fraudulent activity began, we cannot know what effect it may have had on the debt. Any decision on this issue by this Court would be pure speculation.

Finally, the trial court provided contradictory findings regarding fraud. The trial court correctly set out the elements of fraud, which are: "(1) an intentional misrepresentation of an existing material fact, (2) knowledge of the representation's falsity, and (3) injury caused by reasonable reliance on the misrepresentation." *Lopez v. Taylor*, 195 S.W.3d 627, 634 (Tenn. Ct. App. 2005) (citations omitted). The trial court then found that both Southland Transportation and SecurAmerica (through Messrs. Harrell and Reagan, respectively) committed fraud. However, at other times in its judgment, the trial court states that Appellants never inquired as to the status of the loan, and thus could not have relied on any misrepresentation. Likewise, the trial court notes, as mentioned above, that Appellants did not prove their injury because they did not prove the balance of the liquidated accounts receivable.[17] Both of these findings negate the elements of fraud. If there was no misrepresentation, and no injury, how can there be fraud? We cannot state an opinion as to the existence of fraud for lack of sufficient findings, but note only that the findings that were made are incomplete and contradictory.

### ii. Implied Covenant of Good Faith and Fair Dealing

---

[17]The trial court thus found that Appellants did not meet their burden of proof under Tenn. R. Civ. P. 8.03. To this point, we note that Appellants asserted fraud as both an affirmative defense and as a cause of action. From our review of the record, the trial court never ruled on the latter.

Apart from fraud, Tennessee common law also imposes an implied covenant of good faith and fair dealing in the performance of contracts. *See* ***Wallace v. Nat'l Bank of Commerce***, 938 S.W.2d 684, 686 (Tenn. 1996). This Court has stated that the purposes of this implied duty are two-fold: to honor the reasonable expectations of the contracting parties, and to protect the rights of the parties to receive the benefits of their agreement. ***Goot v. Metro. Gov't of Nashville & Davidson Cnty.***, No. M2003-02013-COA-R3-CV, 2005 WL 3031638, at *7 (Tenn. Ct. App. Nov. 9, 2005) (internal citations omitted). Thus, the contours of this duty may vary according to the terms of the contract and the performance rendered by the parties. ***Wallace***, 938 S.W.2d at 686 (citing ***TSC Indus., Inc. v. Tomlin***, 743 S.W.2d 169, 173 (Tenn. Ct. App. 1987); ***Covington v. Robinson***, 723 S.W.2d 643, 645-46 (Tenn. Ct. App. 1986)). However, this implied duty does not "create new contractual rights or obligations, nor can it be used to circumvent or alter the specific terms of the parties' agreement." ***Goot***, 2005 WL 3031638, at *7 (internal footnotes and citations omitted).

The implied covenant of good faith and fair dealing binds parties to a contract "'to act in word and deed, in a responsible manner.'" ***Williams v. Maremont Corp.***, 776 S.W.2d 78, 81 (Tenn. Ct. App. 1988) (quoting Gibson's Suits in Chancery, 6th Edition, § 34). Furthermore, this duty proscribes actions which "intentionally or purposefully do anything that would have the effect of 'destroying or injuring the right of the other party to receive the fruits of the contract.'" ***Dunn v. Matrix Exhibits, Inc.***, No. M2003-02725-COA-R3-CV, 2005 WL 2604048, at *3 (Tenn. Ct. App. Oct. 13, 2005) (quoting ***Winfree v. Educators Credit Union***, 900 S.W.2d 285, 289 (Tenn. Ct. App. 1995) (quoting 17 Am. Jur. 2d Contracts § 256 (1964)); *see also* Restatement (Second) of Contracts § 205 (1979).

Whether a party acted in good faith is a question of fact. ***Lamar Adver. Co. v. By-Pass Partners***, 313 S.W.3d 779, 791 (Tenn. Ct. App. 2009), *perm. app. denied* (Tenn. March 15, 2010). "[I]n determining whether the parties acted in good faith in the performance of a contract, the court must judge the performance against the intent of the parties as determined by a reasonable and fair construction of the language of the instrument." ***Wallace***, 938 S.W.2d at 686 (citing ***Covington v. Robinson***, 723 S.W.2d 643, 645-46 (Tenn. Ct. App. 1986)). "[T]he common law duty of good faith does not extend beyond the agreed upon terms of the contract and the reasonable contractual expectations of the parties." ***Id.*** at 687 (citing ***Sheets v. Knight***, 779 P.2d 1000 (1989)).

In the present case, although the issue was plainly litigated at trial, the trial court's judgment did not address Appellants' affirmative defense that SecurAmerica violated the implied covenant of good faith. A finding by the trial court that SecurAmerica breached the duty of good faith may affect Appellants' liability as guarantors. On the other hand, a finding that SecurAmerica did not breach the duty of good faith would appear to contradict the trial court's finding that SecurAmerica acted fraudulently. Regardless, without a finding of fact

by the trial court on the issue of good faith, this Court is left without a basis for review and can only speculate as to the nature of the trial court's judgment.

## 5. Conclusion

In the face of these inadequate and contradictory findings regarding the issues of fraud and the implied covenant of good faith and fair dealing, we are simply unable to conduct meaningful judicial review. We sympathize with the trial court, which aptly noted that "[f]raud and poor record keeping made this case so labyrinthine that it required the Court to make a careful review of a tangled record full of allegations of multifarious behavior on the part of all involved." Unfortunately, this snarl of litigation has only been exacerbated on appeal.[18] A case of this factual complexity requires findings that are detailed, specific, and logical. Furthermore, as the case involves cross-allegations of fraudulent behavior, credibility determinations may be required. These tasks fall to the trial court, and until they are completed, we cannot review the actions taken below.

Because the issues upon which we lack sufficient findings, (i.e., those relating to allegations of fraud and the lack of good faith) are central to a complete review of this case, it would be premature to address the other issues raised by the parties. Consequently, all other issues are pretermitted at this time.

For the foregoing reasons, we vacate the decision of the Shelby County Chancery Court and remand for further proceedings consistent with this Opinion. Costs of this appeal are taxed one-half to Appellants, Karl Schledwitz and Terry Lynch, and their surety, and one-half to Appellees, SecurAmerica Business Credit, for which execution may issue if necessary.

_____
J. STEVEN STAFFORD, JUDGE

---

[18]The parties provided an appellate record that is both excessive and incomplete. The record is at times superfluous (*e.g.*, it unnecessarily contains: (1) full transcripts of the trial as well as extensive excerpts; (2) motions and responses irrelevant to the issues on appeal; and (3) trial briefs and discovery papers). At other times it lacks essential information (*e.g.*, it omits multiple evidentiary exhibits introduced at trial). *See* Tenn. R. App. P. 24(a).